## MILTON et al. v. H. C. STONE LUMBER CO.

District Court, S. D. Illinois, N. D.
November 24, 1928.

No. 1520.

Judgment affirmed in 36 F.(2d) 589.

Whitnel & Whitnel, of East St. Louis, Ill., and Mansfield & Cowan, of Peoria, Ill., for plaintiffs.

Tichenor, Todd, Wilson & Barnett, of Peoria, Ill., for defendant.

FITZHENRY, District Judge. Plaintiffs were the owners of a large tract of timber land in Washington county, Mo. In March, 1920, J. W. Beck of Olney, Ill., a sort of a lumber broker, learned that plaintiffs wished to sell some lumber. He called on plaintiff Milton at East St. Louis, where the latter was engaged in the live stock business, and arranged to go to Missouri, ostensibly to see the timber and to talk with the other partner, Mr. Bass. Beck had been connected with defendant corporation for a number of years. When he located a satisfactory lot of lumber, he would report his findings and recommendation to the Stone Lumber Company. If it cared to do so, it would buy the lumber, or reject the proposition. About the middle of March, 1920, Beck made a trip to plaintiffs' land and sawmill near Steelville, Mo., the nearest shipping point being Elair, Mo. March 16, 1920, Beck reported to defendant that there was available red and white oak lumber grading No. 2 and better, and there was an amount of one-half to one million (presumably feet) available; that the lumber would run possibly 40 per cent. firsts and seconds, 45 per cent. No. 1 common, 15 per cent. No. 2 common; that plaintiffs expected to pick over the timber and saw the best only on account of the lumber haul; that of course would make a better grade. He also reported: "These people are out for the value of their lumber and are figuring with others. I think that Steel & Hibbard will be the strongest bidders. I am promised the stock if our prices are as good as others, and they will get the others prices."

On that first visit, in a conversation with plaintiff Milton, Beck told Milton that his partner claimed he was getting $100 for firsts and seconds, $75 for No. 1 common and $50 for No. 2 common; that he "thought we could pay him this price for the lumber, provided we did not have to take too much No. 2 common. That the Stone Lumber Company rarely ever bought No. 2 common. But I have induced them at different times to accept some to enable me to make contracts and that if I thought that the amount would not exceed 15 or 20% of #2 common that they would accept." There were some few negotiations

and another trip by Beck to Missouri. Beck and plaintiffs talked together when plaintiffs assured Beck they would only cut the best timber; that it was the purpose of Bass to go into the woods and mark the trees he wanted the cutters to cut and the loggers to bring to the mill to cut lumber from that would net them from $70 to $75 per car. · In order to make the lumber bring $70 to $75 a car, it would have to run 25 per cent. firsts and seconds, 60 per cent. No. 1 common and 20 per cent. No. 2 common; Beck figured that those percentages would give plaintiffs $70 and $75 per car. The date of the last conversation with Milton and Bass was on May 15, 1920. The next day, from Mount Vernon, Beck made a report to defendant, as follows:

"5—16—1920

"I made the trip with A. J. Milton to his timber that they are just now working.

"We can get 100,000 feet sawed in 90 days. about 70% Red Oak about 30% white oak will run about 25% F. A. S. 60% #1 common 15 to 20% #2 common

"Price 100.00 75.00 and 50.00

"50% advance on stick

"There is no trick for them to sell others at the above prices he has a pardner runninning another mill individually that is selling 100,000 feet at these prices and they are trying to get this lot

"You will have to wire here tomorrow or write or wire A. J. Milton National Stock Yards Ill. That you accept the business as per our understanding.

"Should you delay it you will not get the lumber.

"Beck."

On May 17th, defendant wired Beck: "We will take the Milton Oak deal." The next day a letter was sent to Beck by defendant, confirming the message and stating that the writer would be out of town for a few days, but upon his return would make up a proper order. On the bottom of this note, Beck wrote, under date of the 20th of May: "I will get your contract signed when you send it. Beck." On May 27th, Milton wrote Beck, at Mount Vernon, that Bass had called him on the telephone and told him he had 30,000 feet of lumber sawed at the mill and would like to have Beck come down the next week to grade what he had on the yard. Beck went to Missouri to grade. the lumber and found that plaintiffs had: 200 feet of F. A. S., 4,297 feet of No. 1 common, 4,204 feet No. 2 common, red oak; 68 feet F. A. S., 418 feet No. 1 common, and 289 feet No. 2 common, white oak. On May 17, 1920, upon receipt of defendant's message, Beck wired Mil-

ton: "Accept deal as agreed Write me outlining your understanding." On May 18th, Milton wrote Beck:

"The purpose of this letter is in accord with our conversation and contract between J. W. Beck and Milton & Bass for lumber contracted by Milton & Bass to J. W. Beck.

"We understand the following:

"Milton & Bass are to furnish J. W. Beck with 100,000 (One Hundred Thousand) feet of Oak Lumber at the following prices; $100.00 per thousand for first and second. $75.00 per thousand for No. 1 common, $50.- 00 per thousand for #2 common.

"Milton & Bass agree to deliver said lumber F. O. B. cars Elair Switch, Missouri.

"This lumber is to be graded at our mill in Washington County, and when there is as much as 20,000 feet or more sawed, J. W. Beck agrees to grade same at our mill in Washington County and to advance fifty per cent of purchase price on same.

"Milton & Bass agree to deliver said lumber to Elair Switch as soon after grading is completed at the mill as rapidly as it is possible to move it after J. W. Beck is ready to have same moved.

"Milton & Bass retain the right to move lumber to Elair Switch on or before December 1st, 1920 providing lumber has been sawed at least ninety days before moving."

A letter of transmittal accompanied this letter, asking Beck to sign and return Milton a copy. On the bottom of the letter of transmittal, which was returned to Milton, Beck wrote: "Friend A. J. M. Your contract is O. K. both as to understanding and wording. The same is to be between you and H. C. Stone Lbr. Co. who will make up their regular forms and I will send you for acceptance. With best wishes and I will agree to the right thing about the fish. Beck." Between the receipt of the letter of May 18th and May 27th, Bass claimed to have accumulated 30,- 000 feet of lumber at the mill and asked Beck to come and grade it, which he did, with the results just above shown, and it was found that instead of being 30,000 feet of lumber there was less than 10,000 feet.

A report of this inspection was made to defendant. In a letter dated June 15th, by Milton to Beck, Milton called the attention of Beck to the fact that "you were going to try to get us (Milton and Bass) a market for our No. 2 stuff for bridge planks." Incidently Milton advised Beck that Bass had told him he had graded 100,000 feet of his other lumber at the switch and he understood him to say it averaged $78, and he had only about 2,000 feet culled out, and he thought "our

lumber that he (Bass) is sawing now since you were there is much better than what you worked on." Under date of June 16th, Bass wrote Beck, at Mount Vernon, he would be ready for him to inspect the lumber; that he had between 25,000 and 30,000 cut again to inspect and asked Beck to come June 21st or 22d. Beck appeared again and graded the lumber as follows: Red oak No. 1 common, 1,759 feet; white oak No. 2 common, 980; red oak No. 2 common, 1,511; white oak F. A. S. 377, red oak F. A. S. 117, white oak No. 1 common, 1,828. Upon returning to Mount Vernon, under date of June 26th, Beck wrote both Milton and Bass concerning the amount of lumber they were producing; that he had told the office that plaintiffs were to pick choice logs and cut lumber from only logs that would produce running strong to No. 1 common and better. He notified them in that letter as follows:

"They (defendant) are dissatisfied with the turn outs and unless we can give them a better looking deal they do not care to continue. We think that 20% would be as much #2 as we should be required to take, and I think we would continue receiving only 20% #2 and getting 20,000 ft. each visit.

"I promised a better lot of lumber than we are getting and think that if your logs were picked that you would get it. I think that that was your understanding also."

On July 8th, Beck wrote Milton, complaining bitterly, saying: "It was mentioned between you and Bass that if you could get 100000 ft. of good lumber that would net you around $75.00 on the car that it would pay you to proceed, and if you could not get lumber to grade sufficient to get you something like this amount that you did not want to fool with it," and appealing to Milton to use every effort with Bass to get him to cut lumber that could be handled by defendant. Under date of July 1st, defendant wrote plaintiffs, calling their attention to the fact that Beck had inspected "two little bunches of Oak from you. Instead of running as we understood it would, on the basis of 25% of better 1st and 2nds, 65% #1 Common, and not over 10% or at the outside 15% strictly high grade #2 Common, it is running very very heavy to the #2 Common grade.

"* * * The stock is running so heavy to the #2 Common grade that it will be material we cannot use."

Plaintiffs were advised that apparently from Beck's inspection the lumber was coming out of very poor logs indeed. "If you cannot get it out of good logs, and in lots of 20,000 ft. so that he won't have to run over there at a big expense for little take-ups, we will not be able to take the stock." Under date of July 6th, Milton answered from East St. Louis, saying he was much surprised at the attitude of defendant's letter and, "I also do not understand why you did not send your regular form of contract immediately after Mr. Beck had made this contract with us," and suggesting that probably the contract was being held back for a sinister purpose. On the same date Milton wrote Beck at Mount Vernon, complaining about defendant's letter and saying, "They have never sent the contract to be signed as they promised and they have not sent me any check for the lumber that you have already taken up," and again appealing for a check.

Upon the theory that there was a contract, plaintiffs began accumulating lumber at their mill and urging the inspection and grading of small amounts, regardless of the fact that no formal contract had been executed by the Stone Lumber Company, as had been suggested would be furnished. Beck made no contracts for the Stone Lumber Company, and this fact was understood by plaintiffs—that the formal contract would have to be prepared, and on the form of the defendant company, and would be sent for acceptance and execution by plaintiffs. Beck, as an investigator and scout, upon his return from Missouri, made a report concerning the proposed Milton & Bass deal, and urged immediate acceptance of the proposition. The representation Beck made was:

(1) That Milton & Bass were at that time now working the timber;

(2) "We can get 100,000 feet sawed in *90 days*," about 70 per cent. red oak and about 30 per cent. white oak, that will run "about 25 per cent. F. A. S., 60 per cent. No. 1 common, 15 to 20 per cent. No. 2 common;

(3) Price "100.00—75.00 and 50.00. 50% advance on stick."

Beck urged defendant to wire him at Mount Vernon "tomorrow or write or wire A. J. Milton, Stock Yards Ill." Upon this representation to defendant, the defendant wired its agent: "We will take the Milton Oak deal." Beck then gratuitously wired Milton that defendant would accept and asking Milton to write him a letter embodying his understanding. Milton did so and Beck okeyed what Milton said, both as to "understanding and wording," on Milton's letter, which was returned to Milton, and also wrote: "The same is to be between you and H. C. Stone Lbr. Co., who will make up their regular

forms and I will send you for acceptance." The form was never made up and never accepted.

If the parties had stopped there, there would have been no contract, but the entire deal would have remained in the making until the form of contract had been accepted and executed. However, acting upon the theory that the understanding and the letter of May 18th was a sufficient contract, Milton & Bass went ahead to carry it out and defendant began sending Beck to Missouri to grade the lumber and make reports, which were received by defendant. We think this was a ratification on the part of defendant of what the understanding was. The letter of May 18, 1920, standing alone, was not a sufficient contract, unless it is considered in the light of the other understandings which Beck had had with his principal. When defendant wired, "We will accept Milton Oak deal," it said, in effect, it would accept the deal outlined in Beck's letter of May 16th. Beck had no authority to notify plaintiffs that any other understanding would be acceptable. The memorandum of May 16, 1920, fixed the amount of lumber to be sawed in 90 days, a certain percentage of red oak and another of white oak; that it was to run 25 per cent. firsts and seconds, 60 per cent. No. 1 common, 15 to 20 per cent. No. 2 common; the price was to be $100, $75 and $50. Even in the alleged acceptance of the Milton contract by Beck, Milton was notified that the contract was to be between Milton & Bass and H. C. Stone Lumber Company, "who will make up their regular forms and I will send you for acceptance." In other words, Milton was duly notified that a strict construction of Milton's letter of the 18th of May was not to be the contract between the parties. They had been notified repeatedly that the Stone Lumber Company very seldom bought any No. 2 common oak; that occasionally Beck could get them to accept a little material of that kind in order to permit him to make a contract.

In the light of these facts, it is not strange that a disagreement developed between defendant and plaintiffs as to just what the contract was. All through the relations in May, June, and July, there was complaint on the part of Beck and defendant that the lumber which plaintiffs were presenting to be graded was not the kind of lumber which the Stone Lumber Company considered it had bought. Undoubtedly plaintiffs sought to construe their contract to be $100, $75, and $50, respectively, for the various grades, mill run, and that any lumber that came within the specified grades they were entitled to dispose of to defendant, regardless of the amounts and proportions. That such a conclusion and construction of the relations between the parties, on the part of plaintiffs, was unwarranted, is clear from the testimony of Beck as well as that of Milton and Bass. In the very beginning of the negotiations, Beck had advised plaintiffs that he would be unable to get defendant to take over 15 per cent. and not to exceed 20 per cent. of No. 2 common. The first report upon the lumber was that it would run 40 per cent. firsts and seconds, 45 per cent. No. 1 common and not over 15 per cent. No. 2 common.

Afterwards, with only five or six days left within which plaintiffs were entitled to complete their contract, defendant wrote, under date of August 11th, to Milton & Bass, National Stock Yards, Illinois: "Now, we will say this as regards *the stock that he has inspected*, we will take all the 1st & 2nds, and all the #1 Common, and not to exceed 15% of #2 Common, and load it out. If you want us to go ahead on this basis, telegraph us and as soon as you can get cars, we will have Mr. Beck there to measure, load and ship. Then, we do not care to go further into this deal until we get cleaned up on this matter, then we will be glad to take it up with you again as a new matter entirely. If you had started out and gotten out the stock as we had contemplated and gotten it out as promptly as we expected, it would have all been cleaned up and sold long ago. If this is not satisfactory, we will simply drop the entire matter."

On July 1st, with half the time of the contract left in which to complete it, defendant notified plaintiffs: "The stock is running so heavy to #2 common grade that it will be material we cannot use." In other words, in the last communication, a bona fide controversy had arisen between plaintiffs and defendant as to whether or not there was a limitation upon the proportion of stock that would grade No. 2 common that was to be taken; that there was a proposition made on August 11th to plaintiffs to take up all the lumber which Milton & Bass had which would come within the limitation of the understanding which defendant thought it had agreed to accept; that it did not want to go any farther with the deal until "we can clean up on this matter and then we will be glad to take it up with you again as a new matter entirely." This case is clearly illustrative of the embarrassments that come to persons who treat upon the basis of an oral understanding and in contemplation of a written contract to

be executed after the executory sale is in progress of execution.

 Plaintiffs relied upon the letter of August 11th as amounting to a repudiation of the contract which it claims was consummated on May 17, 1920, when defendant wired Beck: "We will take the Milton Oak deal." The proposition containing an outline, including the terms specified in Beck's letter to defendant of May 16th, was the understanding which Beck had urged his principal to accept and which it did accept, as evidenced by its telegram of May 17th. Those specifications and limitations are either in the contract between the parties, or there was no contract.

Much reliance is placed upon the holding of the United States Supreme Court in Roehm v. Horst, 178 U. S. 1, 20 S. Ct. 780, 44 L. Ed. 953, by plaintiffs, upon the conclusion that defendant's letter of August 11th, to Milton & Bass, was a repudiation of the contract, and that therefore plaintiffs were not required to complete their contract, could treat the entire contract at an end, and sue for anticipatory damages. The court is asked here to allow damages to plaintiffs equal to the difference between the contract price and the cost of performing it.

It must be observed that in defendant's letter of August 11th, it is expressly stated: "We will say this as regards the stock that he has inspected, we will take all the 1sts and 2nds, and all the #1 Common, and not to exceed 15% of #2 Common, and load it out." Instead of repudiating the contract, this was an offer on the part of defendant to enforce the performance of it, as defendant understood it.

"And an anticipatory breach of an executory contract results from a positive, unconditional and unequivocal declaration by a party thereto of a fixed purpose not to perform the contract in any event or at any time." Dingley v. Oler, 117 U. S. 490, 6 S. Ct. 850, 29 L. Ed. 984; Roehm v. Horst, 178 U. S. 1, 20 S. Ct. 780, 44 L. Ed. 953; Lake Shore & M. S. R. R. v. Richards, 152 Ill. 59, 38 N. E. 773, 30 L. R. A. 33; Zuck v. Mc‧Clure, 98 Pa. 541.

Defendant's letter of August 11th does not bring plaintiffs within the rule in the foregoing cases with reference to an anticipatory breach. Plaintiffs base their right to a rescission of the contract and to recover anticipatory damages by reason of an anticipatory breach because of the refusal of defendant to take some 25,000 feet of oak lumber, mill run, regardless of the proportions of the grades. The authorities all hold that

the failing party must have renounced the contract unequivocally and willfully and placed it beyond the power of the defaulting party to perform his obligations in every material respect.

The New York Court of Appeals, in Callanan v. Keeseville, Ausable Chasm & L. C. R. Co., 199 N. Y. 268, 92 N. E. 747, said that the rescission of a contract is not permitted for a casual or technical breach, but only for a willful breach of a contract, so substantial as to defeat its object.

In St. Regis Paper Co. v. Santa Clara Lumber Co., 186 N. Y. 89, 78 N. E. 701, a controversy arose between the plaintiff and defendant as to who was in fault as to the completion of the contract. Pending negotiations for arbitration, defendant notified plaintiff that the contract was rescinded. The court said: "The company's position was taken in good faith, and it continued to insist on the performance of the contract * * * defendant was not entitled to rescind."

In Gray v. Green, 9 Hun (N. Y.) 334, the court said: "A mere refusal itself, before the arrival of the time designated for performance, not united with any other circumstance tending to show an actual abrogation of the contract, or a design on the part of the other party to act upon it, will not be sufficient to maintain an action for the breach of an existing agreement."

Other cases holding similarly are: Brady v. Oliver, 125 Tenn. 595, 147 S. W. 1135, 41 L. R. A. (N. S.) 60, Ann. Cas. 1913C, 376; Ackley & Co. v. Hunter, etc., Co., 166 Ala. 308, 51 So. 964; Wells v. Hartford Manilla Co., 76 Conn. 34, 55 A. 599; Bannister v. Victoria Coal & Coke Co., 63 W. Va. 502, 61 S. E. 338; Victor Safe & Lock Co. v. O'Neil, 48 Wash. 183, 93 P. 214.

The letter of August 11th was in effect a request by defendant to plaintiffs to perform at the time as far as was within their power, so far as their stock in hand would permit. That is, to perform in harmony with defendant's interpretation of plaintiffs' obligation. There is some intimation on the part of plaintiffs that the chief reason for the firm position taken by defendant was to nullify the contract on account of the decline in the market value of the subject-matter of the contract, but the plain offer of defendant in its letter, at the conclusion of the relations, shows a contrary disposition on the part of defendant.

In the early negotiations, plaintiffs explained to Beck that if by picking their logs they could make lumber that would grade and net them $70 to $75 a car, it would pay them

to sell the lumber; but if they could not get lumber that would grade so as to produce an average of $70 to $75 a car, it would not pay them to fool with it. Whereupon Beck explained that if the lumber would grade No. 1 or better, with not to exceed 15 to 20 per cent. of No. 2 common, their lumber would net them $70 to $75 a car, and that defendant would not want any more than that percentage of No. 2 common. So, it must have been understood throughout the entire negotiations that No. 2 common was to be a very small percentage of the take-up under the arrangement between the parties.

After defendant offered to take all of the lumber which plaintiffs had that would grade No. 1 common and better, with not to exceed 15 per cent. of No. 2 common, and after plaintiffs' apparent refusal of the suggestion, plaintiffs considered the contract at an end and sold practically all of the stock on hand to another dealer. The record shows that plaintiffs' new purchaser was more liberal in his gradings than Beck, and yet the average purchase price procured, which was upon the same price basis as the arrangement between the parties to this suit, produced a little less than $68 a car. This showing clearly established that even with the more favorable grading of the new purchaser, the lumber was considerably below the grades necessary to produce from $70 to $75 a car under the contract with the Stone Lumber Company. Throughout the entire negotiations, it was made plain to plaintiffs that defendant could use but very little No. 2 common.

So, the position of defendant, in its letter to plaintiffs of August 11th, made it clear there was a disagreement with reference to the amount of No. 2 common which defendant would take under the contract. This was the subject of a serious good-faith controversy between the parties, defendant contending that it could not use the stock by reason of the low grade; plaintiffs contending, in effect, that defendant was required to take the mill run of lumber so long as it graded F. A. S. No. 1 and No. 2 common, regardless of the proportions.

The record is quite clear that defendant really wanted the lumber if it graded as defendant contended it should have graded. Milton & Bass did not deliver the inspected lumber in their possession to defendant, as requested, nor did plaintiffs offer any other or additional lumber, within the 90-day period specified by Beck in his report to defendant. In the negotiations which resulted in a determination of the relations between the parties whereby it was the clear purpose of defendant to have settled the question as to how much No. 2 common it was required to take under the contract, it was apparent plaintiffs had a market with defendant for every piece of lumber which plaintiffs had which was within the grades and percentages covered by the contract. At that time plaintiffs had on their hands 25,333 feet of lumber which they claimed was ready for delivery. Of that amount, substantially 20,000 feet was immediately sold at the contract price to another dealer, a third person.

■ Under the authorities, plaintiffs, having no right to declare a rescission of the contract, were not entitled to anticipatory damages based upon the difference between the contract price and the cost of performance to plaintiffs. If they had suffered any damage at that time by reason of the disagreement between the parties, their remedy was clearly the difference between the contract price and the market price. The great preponderance of the evidence establishes the fact that throughout the 90-day period from May 17th to August 17th and for several months thereafter, lumber of the kind and grades sought to be purchased by defendant had a well-established market value far in excess of the contract price. It is true plaintiffs claim they made an unsuccessful effort to find some more buyers, but notwithstanding that fact it is thoroughly shown that there was a well-established market value in excess of the contract price for the subject-matter of this contract.

Defendant made it clear it would go no farther with the contract until the controversy with reference to the percentage of No. 2 common was settled.

Just before the letter of August 11th from defendant to plaintiffs, plaintiffs wrote a note to Agent Beck, under date of August 7, 1920, but there is no showing that this letter ever was forwarded by Beck to defendant. In that note plaintiffs proposed that they would continue to saw only the choicest logs; that plaintiffs had offered to let defendants off with 50,000 feet instead of 100,000 "and guarantee them that they need not take over 25% of #2 Common in the 50,000 feet, and also told them that they need not grade any more lumber until there was enough to finish out the 50,000 feet, which would save the expense of going there to grade small lots as they seemed to have kicked on that." While there is no showing that plaintiffs' letter of August 7th ever reached defendant, yet it does clearly show that there was a bona fide disagreement between the parties as to the proportion of No. 2 common to be taken.

In none of Beck's conversations with plaintiffs had he intimated that defendant could be sold lumber which carried more than 20 per cent. of No. 2 common, and then the take-ups were to have been from lots of lumber not less than 20,000 feet. All of the lumber tendered by plaintiffs exceeded the maximum amount of No. 2, and at no time during the relations had plaintiffs tendered a take-up of 20,000 feet. For these reasons, defendant might at any time have declared the relations at an end, yet it did not do so, and had defendant in its letter of August 11th offered to accept all of the lumber of proper grades, including No. 2 common up to 20 per cent., it would have been an offer of full compliance with the understandings between Beck and defendant most favorable to plaintiffs. However, acting upon the representation of Beck that the amount of No. 2 common was to run from "15 to 20%" was optional with the defendant, it took its very firm stand, for at that time plaintiffs had a right to deliver lumber that would grade first and second, No. 1 common and No. 2 common with not to exceed 15 to 20 per cent. To the extent that defendant offered to take all of the lumber on hand, including No. 2 common, of not to exceed 15 per cent., rather than 20 per cent., there was a technical default on the part of defendant. By reason of the fact that at the time of the breach, assuming that the alleged contract was breached by defendant August 11, 1920, the market price of lumber of the grades and quantity involved in this controversy was considerably higher than the contract price, plaintiffs will be entitled to but nominal damages in this case.