PACIFIC COAST ENGINEERING COMPANY, a corporation, Appellant,

v.

MERRITT–CHAPMAN & SCOTT CORPORATION, a corporation, Appellee.

Nos. 22230, 22230A.

United States Court of Appeals
Ninth Circuit.

May 12, 1969.

David M. Heilbron (argued) and Norman B. Richards, of McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., Oliphant, Hopper & Stribling, Oakland, Cal., for appellant.

David W. Lennihan and Alvin J. Rockwell, of Brobeck, Phleger & Harrison, San Francisco, Cal., for appellee.

Before POPE* and CARTER, Circuit Judges, and McNICHOLS,** District Judge.

JAMES M. CARTER, Circuit Judge:

On October 19, 1959, Pacific Coast Engineering Company (hereafter Paceco) sued Merritt-Chapman & Scott Corporation (hereafter Merritt-Chapman) in the California Superior Court in two actions, one for breach of contract and one for money withheld and interest.[1] The actions were removed to the United States District Court in San Francisco. The district judge held that Paceco had committed an anticipatory breach and that Merritt-Chapman was justified in cancelling the contract. The court awarded damages to Merritt-Chapman on its counterclaim in the sum of $46,823.00. Paceco appeals the judgment.

## QUESTIONS PRESENTED

There are two questions involved in this appeal. One is whether the district court's interpretation of the obligations of the parties under the terms of the contract is clearly erroneous; the other is whether Paceco was in breach of contract thus justifying Merritt-Chapman's cancellation.

## FACTS

The appellee, Merritt-Chapman, was the prime contractor in the Priest Rapids Project, which involved the construction of a dam on the Columbia River in the State of Washington. In the summer of 1957, Merritt-Chapman entered into a contract with Pacific Car & Foundry Co., (hereafter Pacific, and not a party hereto), in which Pacific agreed to manufacture and deliver dam gates for the project.

On August 7, 1957, Paceco submitted a bid for hoists to raise the gates to be made by Pacific. The prices in the bid were based upon pre-bid calculations made by Paceco for its own use only. On September 19, 1957, Merritt-Chapman accepted Paceco's August 7 bid for the

---

* Hon. Walter L. Pope, Senior Circuit Judge, died March 27, 1969. He participated in the case, heard argument and voted to affirm. He did not see this opinion.

** Hon. Ray McNichols, United States District Judge, District of Idaho, sitting by designation.

1. There were two actions in the court below, No. 38,676 in which Paceco, plaintiff and appellant, sought damages for the cancellation of a contract for the fishgate hoists and No. 39,983, in which Paceco sought damages: (1) for $10,000 plus interest for monies wrongfully withheld; and (2) damages for $14,469.72 as interest on late payments. Defendant and appellee, Merritt-Chapman counterclaimed in both actions for $46,823.00 which it recovered by the judgment in the district court.

In action No. 39,983 Paceco was given judgment for the $10,000 plus interest; was denied recovery as to the $14,-469.72; and by stipulation another counterclaim asserted by Merritt-Chapman was allowed in the sum of $3,460.01.

The judgment entered covered both actions and the appeal was taken in both actions. However, the parties have not briefed and are apparently content with all matters except the award to Merritt-Chapman on its counterclaims for the sum of $46,823.

hoists and issued a purchase order for them.

The capacity of the hoists to be built by Paceco necessarily depended upon the weight of the gates to be lifted. The particular gates were designed so that the force of gravity operated to close them, with the hoists used only to lift the gates into an open position. Therefore, in designing the hoists, Paceco was required to compute the weight of the gates. The following clause appeared in the specifications of the gates.

"*Gate Motion Factor of Safety.* All gates shall have a minimum factor of safety in motion of 1.50 under normal loading conditions. This motion factor of safety shall be defined as equal to the ratio of the dead weight of the gate plus any ballast required divided by the sum of the resisting forces, (wheel friction, rolling friction, and seal friction)."

Contract Specifications 138–100, § 2–02,D,3

Between the time Paceco submitted its bid and Merritt-Chapman accepted it, on August 23, Pacific sent Paceco a statement of its hoist pull capacities. Paceco compared them to the calculations on which the August 7 bid was based and noted wide discrepancies. On August 29, Paceco requested Pacific's underlying calculations. On September 9 Pacific returned the calculations which were prepared for it by a naval architect. Paceco decided that the capacities arrived at by the architect were irresponsible and disregarded them. On October 1 and on October 18, 1967, Paceco requested that Merritt-Chapman help to resolve the differences between its calculations on hoist capacities and those of Pacific. On October 29, 1967, Merritt-Chapman's Project Engineer, Gothro, wrote a letter to Paceco advising that there was a "considerable discrepancy" between Pacific's hoist capacities and those of Paceco. Gothro suggested that Paceco "review these [Pacific's] calculations and your own so that we may arrive at final requirements for the hoists."

Paceco replied to Gothro's request on November 19, 1957. The letter stated in substance that Paceco's hoist capacities were correctly computed on the basis of an understanding with a representative of Harza Engineering Company, the engineer for the project; this understanding apparently supported Paceco's interpretation of the "gate motion factor safety." The letter concluded, "on Items 8 and 9 we are proceeding on the design on the basis of the confirmation from Mr. Paul Maier of the operating conditions which establish the hoist capacity at the lower value."

During the month of December 1957, Merritt-Chapman made certain comments on Paceco's calculations; Paceco sent modified calculations which still were premised on its original understanding of the operating factors to which the gates were to be subjected. On January 16, 1958, Merritt-Chapman wrote to Paceco and stated that Pacific's calculations now agreed with Paceco's. Copies of Paceco's and Pacific's calculations were then forwarded to Harza Engineering Co., the Project Engineer. Harza subsequently telephoned Paceco and informed them that the capacities of the hoists as computed by Paceco were inadequate.

On February 21, 1958, Paceco wrote Merritt-Chapman that Paceco disagreed with Harza's determination that the hoist pulls were inadequate. The following statement was included:

"If, however, the capacities to which we designed our hoists are changed, our present shipping schedule will of necessity be changed in that new designs will have to be made. *This in turn will result in an extra charge for the engineering.* All shipments will be set back correspondingly pending completion of any new design." (emphasis added).

Merritt-Chapman wrote Paceco on February 24, 1958; included was a copy of the letter from Harza to Merritt-Chapman rejecting Paceco's hoist pull computations. Harza's letter pointed out Pa-

ceco's error. "In determining the pull the first item to be considered is the gate motion factor of safety. * * * The motion factor of safety must account for each leaf in movement and must be based on the *starting friction factors*." (emphasis added) In its letter Merritt-Chapman asked for revisions of Paceco's calculations as soon as possible.

On March 10, 1958, Paceco wrote Merritt-Chapman and restated its demand for extra compensations for engineering work. In addition, Paceco asserted that Pacific had the obligation to furnish the hoist pull capacities to Paceco. "As soon as we receive the revised capacities from Pacific Car and Foundry we will furnish the information requested in Harza Engineering Company's letter, and at the same time will submit *our prices for additional engineering,* as well as our revised shipping schedule." (emphasis added)

On March 25 and April 14, 1958, Merritt-Chapman sent revised computations for hoist breakaway loads to Paceco. On April 25, 1958, Paceco wrote to Merritt-Chapman. In the letter Paceco asserted that Merritt-Chapman had misinterpreted the meaning of the "gate motion factor of safety" clause. It then stated that someone else had the responsibility for determining the hoist capacities; so that until they were received, all work would cease. The demand for more compensation was reiterated; "Please be advised that revisions to the hoist capacities from those previously agreed upon in your letters of October 29, 1957 and January 16, 1958 *will result in increased cost on the various units*." (emphasis added)

On May 16, 1958, Merritt-Chapman replied to Paceco's demands.

"In order to expedite matters at this point [when Harza rejected Paceco's computations], MC–S [Merritt-Chapman] undertook to provide hoist pull computations satisfactory to Harza as a basis for hoist design. This concession was given Paceco in the interest of time saved * * *

"In any case, Paceco should be aware of its responsibility for furnishing adequate hoists. So far, design information submitted by Paceco has failed to do this."

On June 4, 1958, Paceco wrote Merritt-Chapman reiterating its statement that increases in hoist capacities will result in increased costs. It further stated that design of the hoists would be completed when final hoist capacities were received from Merritt-Chapman.

On September 8, 1958, Paceco wrote Merritt-Chapman and announced that all further work had been suspended. "As you realize, *we are unable to continue with the engineering work on this Contract, or purchase any materials for fabrication, until these hoist capacities are firmly established and the extra costs incurred by Pacific Coast Engineering Company [Paceco] are agreed upon*." (emphasis added)

On September 12, 1958, Paceco representatives met with Mr. Harry Powell of Merritt-Chapman and told him of the increased prices they were demanding. Powell suggested that they submit a written proposal.

On September 24, 1958, Merritt-Chapman wrote Paceco. The letter stated that Paceco's proposed additional costs had been considered. "We have for some time felt that you are in default and breach in connection with this order. * * * Since you have made it clear that you do not propose to comply with our agreement, it is now no longer possible to work along these lines.

"Therefore we hereby cancel Amendment 4, to Purchase Order P.R. 335, by reason of your default * * *"

On September 26, 1958, Merritt-Chapman wrote to Harza announcing its cancellation of Paceco's contract and requesting approval of Berger Engineering Company as a replacement manufacturer.

Merritt-Chapman's letter of cancellation crossed a letter from Paceco in transit. On September 26, 1958, Paceco

wrote to Merritt-Chapman and confirmed its proposal made on September 12 to Mr. Powell, *i. e.* an offer to produce hoists of increased capacity for a total additional price of $85,285.00. In the alternative it offered to produce hoists of the capacity specified in the contract, as Paceco interpreted the terms, for a smaller extra charge.

> "We are prepared and willing to furnish all of the Fishway Hoists in complete accordance with your purchase order and the specifications at the original contract price, plus the addition for the DC Motors, the increased cost for labor and material due to the delays beyond our control, and the $4200.00 cost for designing the larger capacity hoists."

Finally, the letter reiterated Paceco's earlier statement that it would perform only to the extent required by its own interpretation of the hoist pull specifications in the contract, *i. e.* as to the gate motion factor of safety. "Unless the actions of the engineer and the gate manufacturer can be rescinded or altered, the fulfillment of our contract will not result in producing hoists required to handle the gates now under construction."

Merritt-Chapman secured another contractor and its counter claims for $46,823 were its increased costs for securing the hoists.

## DISCUSSION

(1) *Obligations of the Parties.*

The following findings of fact were made by the district court:

> "9. One and one-half (1½) times running frictions is in the present case less than one (1) times static frictions. The gate motion factor of safety of 1½, if applied to running frictions, would produce gates which would not be heavy enough to close at all."

2. The trial court made its findings as to the correct interpretation of the gate specifications after hearing engineering experts testify for each party. There seems to have been general agreement

> "10. The true interpretation of Section 2–03, D,3 of Specification 138–100 requires that the gates, plus any ballast, have a dead weight equal to or greater than 1½ times the sum of the resisting forces (wheel friction, rolling friction and seal friction) under static, rather than running, conditions."

\* \* \* \* \* \*

> "15. By the terms of its subcontract to supply hoists, Paceco undertook and was required to make the necessary calculations of required hoist capacity, and to design and supply the hoists in accordance with the contract documents and subject to the requirement of Harza's approval and the risk that it might lawfully withhold it."

\* \* \* \* \* \*

> "19. Neither Merritt-Chapman nor Pacific Car nor anyone else, other than Paceco, purported to assume the responsibility for calculation of hoist capacity."

> "20. Paceco did not rely upon anything said by Merritt-Chapman or Pacific Car in connection with calculation of hoist capacity, except for the dimensions involved in Pacific Car's gate design. These dimensions did not adversely affect the rated hoist capacity of the hoists which Paceco was required to supply."

■ Paceco contends that the contract required a gate weighing enough to overcome 1.5 times *moving friction;* it further contends that Merritt-Chapman or Pacific had the responsibility of providing calculations of hoist pull capacity.

We disagree; the evidence fully supports the district court's findings as to the interpretation of the "gate motion factor of safety" and Paceco's obligation in regard to providing its own computations of hoist pull capacities.[2]

among the experts that the gates would not close unless they weighed in excess of the static resisting forces exerted upon them. Paceco's outside expert, Dr. Franzini, Professor of Civil Engineering

(2) *Breach.*

The district court below held that Paceco's refusal to deliver the hoists unless additional payments were made by Merritt-Chapman constituted a material breach of its contract. The appellant contends in this appeal that there was no anticipatory breach of the contract.

Atkinson v. District Bond Co., 5 Cal. App.2d 738, 743, 43 P.2d 867, 869 (1935), is a particularly good statement of the general rule and the law in California.[3]

"To justify the adverse party in treating the renunciation as a breach, the refusal to perform must be of the whole contract or of a covenant going to the whole consideration, and must be distinct, unequivocal, and absolute. The real operation of a declaration of intention not to be bound appears to give the promisee the right of electing either to treat the declaration as *brutum fulmen* and, holding fast to the contract, to wait until the time for performance has arrived, or to act upon the declaration and treat it as a final assertion by the promisor that he is no longer bound by the contract, and as a wrongful renunciation of the contractual relation into which he has entered. If he elects to pursue the latter course, it becomes a breach of contract, excusing performance on his part and giving him an immediate right to recover upon it as such. Upon such election the rights of the parties are to be regarded as then culminating, and the contractual relation ceases to exist, except for the purpose of maintaining an action for the recovery of damages."

Also, 4 Corbin on Contracts § 959, at 853 (1951); Restatement of Contracts § 318 (a) (Supp.1948); Cf. Restatement of Contracts § 323(1) (a), (b) (1932). In each case, it is a question of fact as to whether or not a party has committed an anticipatory breach by repudiating the contract. Gold Mining & Water Co. v. Swinerton, 23 Cal.2d 19, 28, 142 P.2d 22 (1943).

The question to be determined in this case is whether any statement by Paceco is definite and unequivocal enough to constitute an anticipatory breach.

Generally, when there is a disagreement as to the meaning of terms in a contract, one party's offer to perform in accordance with his interpretation is not itself an anticipatory breach. Lowenstein v. Federal Rubber Co., 85 F. 2d 129 (8 Cir. 1936). If the offer appears to be made in the good faith belief that the offeror's interpretation is correct, that will be evidence of his continued adherence to the agreement. Mobley v. New York Life Insurance Co., 295 U.S. 632, 638, 55 S.Ct. 876, 79 L.Ed. 1621 (1935); Kimel v. Missouri State Life Insurance Co., 71 F.2d 921, 923 (10 Cir. 1934); Milton v. H. C. Stone Lumber Co., 36 F.2d 583, 588 (S.D.Ill.1928), affirmed 36 F.2d 589 (7 Cir. 1929).

---

at Stanford University, testified as follows:

"Q. You knew what the intent of the factor of safety was, though, didn't you?

A. Yes.

Q. That is to insure that the gates would go down?

A. This is correct.

Q. *And you calculated that they wouldn't go down using your interpretations?*

A. *That is right.* I made a computation for the static condition with a factor of safety of 1.0 and found that 41 pounds of ballast would be required in order that they go down." (emphasis added)

3. The parties below extensively argued California law to support their respective positions, and have relied on such law on appeal. For the purpose of computing interest on damages awarded, both parties stipulated that California law was determinative. In addition to these actions by the parties, the facts disclose that Paceco was a California corporation whose principal place of business was Alameda, California, and that the hoists involved were to be constructed there. There appears to be an adequate basis for the findings that California law should apply in this case; we have, therefore, assumed that the court below applied the law of California after resorting to the applicable conflict of laws rule.

■ If the offeror is not asserting a good faith interpretation of the contract terms, that fact may be evidence that he is repudiating the agreement. Note, 35 Colum.L.Rev. 105, 105–6 (1935). As the court stated in Loop Building Co. v. De Coo, 97 Cal.App. 354, 364, 275 P. 881, 885 (1929):

> "If one who is bound to perform a contract annexes an unwarranted condition to his offer of performance, there is, in effect, a refusal to perform."

Also Steelduct Co. v. Henger-Seltzer Co., 26 Cal.2d 634, 646, 160 P.2d 804 (1945). To the same effect is Menako v. Kassien, 265 Wis. 269, 273, 61 N.W.2d 332, 334 (1953):

> "The persistent maintenance of an untenable construction of a contract on a matter of essential substance should be regarded as not consistent with a continuing intention to observe contractual obligations."

Also, Goerlitz v. Americal Linseed Co., 117 Okl. 299, 246 P. 240 (1925). Cf. Milton v. H. C. Stone Lumber Co., 36 F.2d 583, 588 (S.D.Ill.1928), affirmed 36 F.2d 589 (7 Cir. 1929).

■ Whether the offer is in good faith or otherwise, it must be "accompanied by a clear manifestation of intention not to perform in accordance with any other interpretation" before an anticipatory breach occurs. 4 Corbin on Contracts § 973, at 911. As the court stated in Stolper Steel Products Corp. v. Behrens Mfg. Co., 10 Wis.2d 478, 103 N.W.2d 683, 689 (1960):

> "In order to constitute an anticipatory breach of a contract based upon a request for a modification of terms, such request must be coupled with an absolute refusal to perform unless such request is granted."

Also, Placid Oil Co. v. Humphrey, 244 F.2d 184, 188 (5 Cir. 1957); Trowbridge v. Jefferson Auto Co., 92 Conn. 569, 103 A. 843, 844 (1918); Vermillion v. Marvel Merchandising Co., 314 Ky. 196, 234 S.W. 2d 673, 674 (1950) (demand for higher price than provided for in the contract);

Anderson, Repudiation of Contract—The Post-Restatement Cases, 6 De Paul L. Rev. 1, 4 (1956). See, Regional Enterprises, Inc. v. Teachers Insurance & Annuity Ass'n, 352 F.2d 768, 775 (9 Cir. 1965); Hertz Drive-Ur-Self Stations, Inc. v. Schenley Distilleries Corp., 119 Cal.App.2d 754, 760–761, 260 P.2d 93 (1953).

■ A willingness to negotiate an offer of performance at variance with the terms of the agreement demonstrates the offering party's intention to abide by the contract and does not result in an anticipatory breach. Regional Enterprises, Inc. v. Teachers Insurance & Annuity Ass'n, 352 F.2d 768, 775 (9 Cir. 1965); Walker v. Shasta Minerals & Chemical Co., 352 F.2d 634, 638 (10 Cir. 1965). However, an offer to engage in "negotiations" at which the offeror will merely reiterate his demands or withdraw them on a condition he has no right to impose, is not sufficient to prevent an anticipatory breach from occurring. Steelduct Co. v. Henger-Seltzer Co., 26 Cal.2d 634, 646, 160 P.2d 804 (1945).

■ In California, for a repudiation to result in an anticipatory breach of contract, it must be "treated and acted upon as such" by the party to which it was made. Wilton v. Clarke, 27 Cal.App. 2d 1, 4, 80 P.2d 141 (1938); Campos v. Olson, 241 F.2d 661 (9 Cir. 1957).

Applying the law to the facts in this case the following conclusions result. Beginning with its letter of February 21, 1958, Paceco first stated that if capacities of the hoists were changed, *i. e.* set at amounts which differed from Paceco's calculations, Merritt-Chapman would have to pay additional compensation for engineering work. This demand was reiterated on March 10, 1958. In Paceco's letter of April 25, 1958, it made a demand for additional compensation on items other than engineering work: "Please be advised that revisions to the hoist capacities from those previously agreed upon in your letters of October 29, 1957 and January 16, 1958 *will result in increased cost on the various*

*units;*" this demand was reiterated in the June 4, 1958 letter from Paceco to Merritt-Chapman. On September 8, 1958, Paceco stated that all further work on the hoists would cease *"until* the hoist capacities are firmly established *and the extra costs incurred* by Pacific Coast Engineering Company *are agreed upon."* A specific demand of $85,285 was made on Merritt-Chapman's representative Harry Powell on September 12, 1958. [This amount is confirmed in Paceco's letter of September 26, 1958.] In its letter written September 26, 1958, without knowledge of Merritt-Chapman's letter of cancellation, Paceco detailed its $85,-285 demand. In the alternative, it offered to produce hoists according to its reading of the contract specifications for the contract price plus "the addition for D.C. motors, the increased cost for labor and material due to the delays beyond our control" and an additional payment of $4200 not provided for in the agreement.

It is apparent from the facts that Paceco was aware that it was attaching an unwarranted condition to its required performance under the contract. After Harza's rejection of the gate and hoist calculations in February 1958, Merritt-Chapman, Pacific and Harza all agreed that Paceco's interpretation of the hoist operating conditions was erroneous. In Paceco's letter of September 26, 1958, it stated: "Unless the actions of the engineer and the gate manufacturer can be rescinded or altered, the fulfillment of our contract will not result in producing hoists required to handle the gates now under construction." It must also have been clear to Paceco that there was no provision for increased engineering fees to correct designs resulting from misinterpretations of hoist specifications.

Finally, the only negotiations which Paceco offered to engage in were to determine how much additional compensation it was to receive. The only negotiations engaged in were those of September 12, at which Paceco merely specified the amount of its demanded additional compensation. The record shows that Paceco was unwilling to consider an interpretation other than its own, or to drop its demand for more money.

■ We therefore conclude that Paceco persistently demanded an unwarranted condition precedent to its required performance; this continued demand culminated on September 8, 1958, with an announcement that no performance would be forthcoming unless Merritt-Chapman paid more money than required by the terms of the contract. This was an absolute refusal to perform in accordance with any interpretation of the contract which differed from Paceco's. Under existing law the district court was correct in finding this statement to be a repudiation of the contract. Merritt-Chapman acted upon the repudiation by cancelling the contract and ordering the hoists from another source; there was no attempted withdrawal of its demand by Paceco. Therefore, the district court was also correct in finding that Merritt-Chapman was justified in its cancellation.[4]

The judgment of the district court is affirmed.

4. We do not consider the contention of the appellee that there was also an actual partial breach of the contract followed by a repudiation, thus justifying the cancellation by Merritt-Chapman. This was not passed on by the court below and is not necessary for a decision in this case.

We wish to commend both parties for submitting high quality briefs. In this regard, we have carefully read the cases cited by the appellant to support its argument that there was no statement made by Paceco which was definite and unequivocal enough to constitute a repudiation; we think that the facts in those cases are distinguishable from the facts in our case.