[No. C059239. Third Dist. Dec. 30, 2010.]

MAMMOTH LAKES LAND ACQUISITION, LLC, Plaintiff and Respondent, v.
TOWN OF MAMMOTH LAKES, Defendant and Appellant.

438

COUNSEL

Law Office of Peter E. Tracy, Peter E. Tracy; Morrison & Foerster, Edgar B. Washburn, Maria Chedid, Shaye Diveley and Anton A. Ware for Defendant and Appellant.

Meyers, Nave, Riback, Silver & Wilson, Steven R. Meyers, Julia L. Bond and Peter S. Hayes for League of California Cities and California State Association of Counties as Amici Curiae on behalf of Defendant and Appellant.

Quinn Emanuel Urquhart & Sullivan, Daniel L. Brockett, John M. Pierce and Daniel H. Bromberg for Plaintiff and Respondent.

OPINION

**NICHOLSON, J.**—Defendant Town of Mammoth Lakes (the Town) entered into a development agreement with Terrence Ballas to make improvements at the Town's airport and to build a hotel or condominium project at the airport. Ballas would initially lease the land for the hotel/condominium project but would later have the option to purchase it. Plaintiff Mammoth Lakes Land Acquisition, LLC (Developer), later acquired from Ballas the right to build the hotel or condominium project.

The Town eventually changed its priorities and no longer wanted the hotel/condominium project. The Town sought help from the Federal Aviation Administration (FAA) to eliminate the Developer's ability to build the hotel/condominium project. The FAA objected to the hotel/condominium project and threatened to cut off federal funding for the airport. However, the Developer demanded that the Town move forward with the hotel/condominium project as contemplated in the development agreement. Despite the demand, the Town refused to move forward unless the parties could resolve the FAA's objections.

Claiming the Town repudiated the development agreement, the Developer sued the Town for anticipatory breach of contract. A jury found that the Town breached the development agreement and awarded $30 million in damages to the Developer. Later, the trial court awarded $2,361,130 in attorney fees to the Developer.

On appeal, the Town contends that the judgment must be reversed because (1) the Developer could not recover in a breach of contract cause of action because it failed to exhaust its administrative remedies, (2) even if contract remedies are available, three clauses of the development agreement give the

Town a complete defense, (3) the Developer failed to establish a repudiation of the development agreement, (4) the evidence of damages was too speculative to support the verdict, and (5) the attorney fees award must be reversed along with the judgment. None of the Town's contentions has merit.

The Developer was not restricted to pursuing the administrative remedies available through the Town's land use application process because the Town violated the development agreement by refusing to move forward with the hotel/condominium project unless the FAA's objections were resolved. Therefore, the judicial remedy is a breach of contract action based on the Town's executive decision not to move forward as required by a contract, not an administrative mandamus action to review a quasi-judicial decision of the Town concerning a land use application. Also, a breach of contract action is appropriate because damages for anticipatory breach of the development agreement are not available in an administrative mandamus action.

With respect to the defenses asserted by the Town based on the language of the development agreement, none requires reversal of the judgment. A clause excusing performance of the development agreement because of governmental restrictions is unhelpful to the Town because those restrictions were under the Town's control. Another clause requiring the parties to comply with the rules and regulations of the FAA did not excuse the Town from performing on the development agreement because the FAA's objections were based on grant assurances made by the Town to obtain FAA funding, not on FAA rules or regulations. And the third clause is likewise unhelpful to the Town. It required the Developer to provide funds matching the FAA's funding. Contrary to the Town's assertion, providing matching funds did not signal the Developer's consent to the FAA restrictions because the evidence established that the Developer neither knew nor ought to have known about the restrictions when providing the matching funds.

The Town asserts that the Developer failed to establish a breach of the development agreement because (A) the Developer failed to establish a breach attributable to the Town; (B) the evidence was insufficient to establish repudiation; (C) the purchase option for the land under the hotel/condominium project was a unilateral contract not yet ripe for breach; and (D) the Town retracted any repudiation. The Developer established a breach attributable to the Town by evidence of the actions of town officials, acting within their authority. Those actions constituted repudiation of the development agreement because they insisted on resolution of the FAA's objections before moving forward with the development agreement, which resolution was not a condition for performance in the development agreement. Although the development agreement included a purchase option for the land under the hotel/condominium project, the breach was of the development agreement,

which was not a unilateral contract. And, despite the claims of town officials that they were willing to move forward with the hotel/condominium project, their actions established that they did not retract the repudiation of the development agreement.

The evidence of damages in the form of lost profits came from three sources: an experienced appraiser of hotel and resort projects, one of the investors in the Developer, and the town manager. Considering the evidence in the light most favorable to the verdict, the evidence of damages was not too speculative to support the $30 million damages award.

And finally, the Town's contention that the award of attorney fees must be reversed is without merit because the Town's sole argument for reversal of the attorney fees award is that it was based on the Developer's status as the prevailing party. The award of attorney fees is valid because we do not reverse the judgment and the Developer remains the prevailing party.

We affirm the judgment and the award of attorney fees.

## HISTORY OF DEVELOPMENT AGREEMENTS

A development agreement is a statutorily authorized agreement between a municipal government (here, the Town) and a property owner for the development of the property. (Gov. Code, § 65865, subd. (a).) One of the main components of a development agreement is a provision freezing the municipality's rules, regulations, and policies governing permitted uses of land and density of the land use, as well as standards and specifications for design, improvement, and construction. (Gov. Code, § 65866.) This provision allows a developer to make long-term plans for development without risking future changes in the municipality's land use rules, regulations, and policies. (*Santa Margarita Area Residents Together v. San Luis Obispo County Bd. of Supervisors* (2000) 84 Cal.App.4th 221, 227 [100 Cal.Rptr.2d 740] (*SMART*).)

The development agreement must be approved by ordinance and is, therefore, a "legislative act." (Gov. Code, § 65867.5, subd. (a).) Because the development agreement is approved by ordinance, it is subject to referendum, which allows the electorate to overturn approval of the agreement. (*Ibid.*) While, as a legislative act, a development agreement can be disapproved by referendum, an unchallenged development agreement is an enforceable contract between the municipality and the developer. Depending on its terms, it may create vested rights in the developer with respect to land use. (See *SMART, supra*, 84 Cal.App.4th at p. 230 [development agreement creates commitments to developers].)

After approval by ordinance, the development agreement is enforceable despite subsequent changes in the municipality's land use laws. (Gov. Code, § 65865.4.) The development agreement may be amended or cancelled only by mutual consent of the parties to the agreement. (Gov. Code, § 65868.)

The Legislature enacted the development agreement statutes in response to the California Supreme Court's jurisprudence on vested rights.

Before 1976, developers in California faced changes in land use laws and policies during the course of long-term development of property. When a change in the land use laws and policies interfered with development already initiated, some developers argued that they had a "vested right" to complete the development despite the changes in the land use laws and policies. It was "the rule in this state and in other jurisdictions that if a property owner has performed substantial work and incurred substantial liabilities in good faith reliance upon a permit issued by the government, he acquires a vested right to complete construction in accordance with the terms of the permit. [Citations.]" (*Avco Community Developers, Inc. v. South Coast Regional Com.* (1976) 17 Cal.3d 785, 791 [132 Cal.Rptr. 386, 553 P.2d 546] (*Avco*).)

In 1976, the California Supreme Court, in *Avco*, decided that no right to complete the work vested until the developer obtained a building permit, even if the developer had already performed substantial work and incurred substantial liabilities on the project. (*Avco, supra*, 17 Cal.3d at p. 793.) The court noted that any change in this common law principle would have to come from the Legislature. (*Id.* at p. 796.)

In 1979, the Legislature's enactment of the development agreement statutes provided a way for the municipality and developer to depart from the common law rule of vested rights. The Legislature declared that "[t]he lack of certainty in the approval of development projects can result in a waste of resources, escalate the cost of housing and other development to the consumer, and discourage investment in and commitment to comprehensive planning which would make maximum efficient utilization of resources at the least economic cost to the public." (Gov. Code, § 65864, subd. (a).)

The Legislature recognized that the newly authorized development agreements would provide benefits for both municipality and developer. The agreements allowed the developer to proceed with a project with the assurance that the project would be approved based on rules, regulations, and policies existing at the time the development agreement was approved, even if those rules, regulations, and policies changed over the course of the development project. (Gov. Code, § 65864, subd. (b).) In 1984, the Legislature added a declaration that development agreements would also allow

municipalities to extract promises from the developers concerning financing and construction of necessary infrastructure. (Gov. Code, § 65864, subd. (c); Stats. 1984, ch. 143, § 1, p. 431.) This declaration makes it clear that the scope of development agreements need not be limited to freezing land use rules, regulations, and policies but can include other promises between the municipality and the developer. Thus, a legislatively approved development agreement gives both parties vested contractual rights.

## FACTS[1]

### The Town's Acquisition of Airport and FAA Funding

The Town took over operation of the Mammoth Lakes Airport (later known as the Mammoth-Yosemite Airport) in 1991 and annexed the property in 1995. The Town desired to improve the airport to host commercial air service to enhance the Town's appeal as a destination for visitors.

Beginning in 1992, the Town received grants from the FAA under the Airport Improvement Program. As a condition for receiving these federal funds, the Town made assurances to the FAA that it would meet any conditions placed on the funding by the FAA. These grant assurances were made part of the funding agreements. One of the assurances made by the Town to the FAA was that the Town would not sell or lease any part of the airport property without approval from the FAA.

### Proposed Development Agreement

In 1997, the Town proposed to enter into a Development Agreement with Terrence Ballas, who had experience in airport development.

The recitals at the beginning of the proposed Development Agreement stated the Town's purposes and goals: "[The] Town has determined that a first-class Airport operation, including an efficient fixed base operation, increased hangar space, modern fuel facilities, a hotel or condominium or residential condominium and related amenities, and space for recreational

---

[1] The Town cites to documents in the appellant's appendix to support many of its statements of fact in its briefs. However, the Town does not indicate whether and when the documents in the appellant's appendix were admitted as evidence at trial. This presents a problem on appellate review because some of the Town's contentions of error, such as the contention that the Developer failed to establish a breach of the Development Agreement, challenge the effect of evidence introduced at trial. Although the Town fails to identify properly the evidence introduced at trial, we conclude that we may ignore this defect in the briefing because (1) there is no serious dispute concerning the facts and (2) the Town's contentions are without merit, even when viewing them in the light of the facts stated in the Town's briefing. (See Cal. Rules of Court, rule 8.204(e) [allowing court to disregard defects in briefing].)

vehicles, will benefit the economy of the Mammoth Lakes area and promote the goals set forth in the applicable vision statements, adopted by the Town, including the goal of becoming a year around [sic] destination resort." The recitals also stated: "[The] Town has further determined that the interests of its tax paying [sic] citizenry can best be served by providing for the funding of Airport operations and development through private capital rather than taxpayer funds, where reasonably possible, and through the privatization of certain services provided at or in connection with the Airport."

The Development Agreement addressed the procedure upon default of one of the parties. It stated: "Failure by either party to perform any material term or provision of this Agreement for a period of thirty (30) days after delivery of written notice of default from the other party shall constitute a default under this Agreement." Upon the offending party's failure to cure the default, the Development Agreement allowed the offended party to "institute legal action against the party in default . . . ."

Under the Development Agreement, Ballas agreed to make improvements to the airport at his own expense, including construction of hangars, a gas storage building, and a terminal, as well as remodeling of an existing terminal. These improvements were designated as Phase I. In Phase II of the airport development, Ballas would, again at his own expense, build a restaurant building, a gasoline station, and a recreational vehicle park.

As part of Phase I, the Development Agreement allowed Ballas to build a hotel or condominium project (which came to be known as the Hot Creek Project), described in the Development Agreement as "time share or similar units, hotel or residential condominium, or a commercial lodging facility for transient guests of a minimum stay of sixty (60) units to be constructed by Developer." In later phases of the development, Ballas would be allowed to build additional hotel or condominium facilities to a maximum of 250 total hotel or condominium units. The hotel/condominium project was to be built on a 26-acre parcel, adjacent to the aeronautical services. In 2027, Ballas would have an option to purchase that parcel. The construction and operation of the hotel/condominium project was a material part of the consideration for the Development Agreement.

The option to purchase the parcel made the Development Agreement economically feasible for Ballas. He would make the improvements and build the hotel or condominiums, initially leasing the land from the Town, then exercising the option to purchase the land.

The Development Agreement required the Town to act reasonably in moving the project along. It stated: "Town and its agents, employees and

contractors shall exercise any discretionary approvals applicable to the Project reasonably, in good faith, and in a timely manner."

The Development Agreement incorporated other documents, such as a commercial development plan and leases. In the lease of the land for the hotel/condominium project, the Town warranted that "it has title to the premises free and clear of liens and encumbrances, that it has the right and power to enter into this lease, and that this lease is made pursuant to the powers vested in [the Town] by laws of the State of California."

*Events Leading to Signing of Development Agreement*

Before the Town entered into the Development Agreement with Ballas, it sought approval from the FAA for the agreement. William Manning, the Town's airport director, sent correspondence to the FAA with details of the Development Agreement and the accompanying leases. The FAA responded by fax: "We need to review 'options'; 55 yr lease creates problems with FAA policy . . . ." The response also stated: "Under current FAA policy and procedure guidance a release of all federal obligations which encumber the property must be obtained from the FAA prior to the notice to sell/purchase the property. The FAA should be given a copy of the option contract for review and comment prior to recording the document."

The town council approved the Development Agreement by ordinance. After the town council's approval, Ballas and the Town's mayor pro tem signed the Development Agreement on August 21, 1997, just nine days after the FAA made known to the Town its reservations concerning the Development Agreement.

While the Town claimed that the Town's airport director discussed the FAA's concerns with Ballas, Ballas testified that the Town did not disclose to him the FAA's concerns about the Development Agreement until seven years later. On appeal, the jury is deemed to have credited Ballas's testimony in this regard. (*Garlock Sealing Technologies, LLC v. NAK Sealing Technologies Corp.* (2007) 148 Cal.App.4th 937, 951 [56 Cal.Rptr.3d 177].)

The Town also did not contact the FAA to discuss its concerns. The Town's airport manager testified: "I believed that [the FAA representative's] form of correspondence was ridiculous. If he had issues or comments that he wanted me to deal with, I believe he would have sent me a formal FAA letter. We correspond regularly with the FAA. This—the fax notes were highly irregular. I just felt like it wasn't an official correspondence and I wasn't obligated to respond to it."

After signing the Development Agreement, Ballas assigned his interest in the Development Agreement to various other entities. He assigned his right to

develop, market, and sell the hotel/condominium project to Mammoth Lakes Land Acquisition, LLC, the plaintiff in this case. Ballas retained a substantial interest in the limited liability company.

Plaintiff, Mammoth Lakes Land Acquisition, LLC, is also known as the Hot Creek Developer. We refer to plaintiff in this opinion as the Developer.

### Phase I Improvements

As part of Phase I of the Development Agreement and within three years of signing the Development Agreement, the Developer spent $15 million to $17 million on improvements to the airport. It built hangars, renovated an existing terminal, and installed a new fueling system and water supply system. The Developer also took over the airport's general aviation operations.

### Hotel/Condominium Complex

In 2000, after the airport improvements had been made and were in operation, the Developer formulated and submitted to the Town an application with a plan for the hotel/condominium project. The plan included residential condominiums. In 2002, town staff raised objections to the plan because it reflected a residential orientation instead of one promoting services to visitors. Town staff urged the Developer to withdraw the application, which the Developer refused to do.

The Developer's application was placed on the agenda for a Town planning commission meeting with a recommendation from staff to deny the application. Even though the Development Agreement allowed residential condominiums, town staff stated that the plan was "inconsisten[t] with entitlements that have been granted to the applicant under the terms of a Development Agreement, and with zoning regulations applicable to the property." In light of the negative recommendation from town staff and an assurance from staff that they would negotiate with the Developer concerning the hotel/condominium project, the Developer agreed to withdraw the application from consideration at the planning commission meeting.

After the Developer's application had been withdrawn from consideration at the planning commission meeting, the Town's community development director sent Ballas a letter on April 1, 2002, about five years after the signing of the Development Agreement, apologizing for the delay in processing the application and recognizing the Developer's right to construct a residential condominium project under the Development Agreement. The letter continued: "Since signing the Development Agreement in 1997, major changes in

the Town's economic climate have occurred; commercial air service is on the horizon, housing prices have increased significantly, and the village is under construction with commercial tenants selected. With these factors in mind, the Town believes that an opportunity exists in a modified plan for a centralized hotel or condominium facility for transient guests surrounded by uses such as residential condominiums which are designed and located to conveniently utilize the resorts [*sic*] amenities and to participate in a visitor rental program at the individual owner's desire. We believe that this type of project will be beneficial financially to both the Town and the developer."

At the suggestion of town staff, the Developer worked with town staff to revamp the plan to have multiple owners of each condominium with a hospitality company to manage the joint ownership and rent out the units when the owners were not occupying them. In 2004, the Developer submitted a revised plan to town staff for informal review. The plan, however, was never submitted formally to the Town for approval.

### FAA Objections and Town's Change of Priorities

In 1999, the Town began working to get commercial air service into the airport. The FAA approved an environmental assessment in 2000, which concluded that the commercial air service, and the associated improvements to the airport, would not have significant environmental impacts. However, this assessment was overturned by a federal court. (*California v. U.S. Dept. of Transportation* (N.D.Cal. 2003) 260 F.Supp.2d 969.) In response to this loss in federal court, the FAA reevaluated the hotel/condominium project and concluded that it had not been adequately subjected to environmental review.

In 2004, the FAA took the position that the grant assurances given by the Town required the Town to obtain the consent of the FAA before executing a lease to use airport property for anything other than an aeronautical use. The FAA asserted that it had not given consent for the nonaeronautical use of the airport property to build a hotel/condominium project. The Town resisted this position, stating that the FAA had approved the entire project, including the nonaeronautical uses, in 1998. Nonetheless, the FAA informed the Town that it could either have expanded air service or the hotel/condominium project, but not both.

Soon after this exchange between the FAA and the Town, the Town changed its position with respect to the hotel/condominium project. In early May 2004, deputy town manager Charles Long told the Developer that the hotel/condominium project was the Town's top priority. However, later the same month, Long stated that expanded air service had become the Town's top priority. Robert Clark, who was hired as town manager in June 2004,

testified that the town council "shared [the] sentiment" that expanded air service was a higher priority than the hotel/condominium project.

In light of the change in the Town's position, the Developer began to feel less secure in its relationship with the Town. The Developer informed the Town that it was taking a "time-out" from the discussion of issues arising from the Development Agreement and would not be attending any meetings concerning the issues. The proposed length of the "time-out" was not stated.

On June 28, 2004, town officials, including deputy town manager Long, met with officials of the FAA. Long told the FAA officials that the Developer's option to purchase the hotel/condominium project was inconsistent with the Town's goals. Long said that the hotel/condominium project might never be built. He asked the FAA to help the Town "get rid of Hot Creek," referring to the hotel/condominium project, because it interfered with expanded air service. To obtain the FAA's assistance in stopping the hotel/condominium project, Long asked the FAA to put in writing its objections based upon the grant assurances given to the FAA by the Town.

On June 29, 2004, the day after the meeting with the FAA, deputy town manager Long sent an e-mail to the Developer. Because the Developer relies heavily on the e-mail to support its repudiation argument, we quote the pertinent part of the e-mail here:

"The FAA is primarily concerned about two issues for your project: First, the compliance issues remain paramount. They are concerned that the airport will run out of land for aeronautical purposes as a result of the land used by the non-aeronautical uses your project represents. They are also concerned about the purchase option. And finally they are concerned about whether the airport has enough land to accommodate competing FBOs [(fixed base operators)]. . . . The FAA intends to send us a specific itemization of these compliance concerns in the next few weeks. Until these issues are resolved, we will be unable to move forward with your project.

"Second, the FAA is concerned that your currently proposed development plan differs significantly from the specifications in the [Development Agreement] and needs NEPA [(National Environmental Policy Act)] review since it occurs coterminously with the EIS [(environmental impact statement)] on the airport expansion. This difference in project scope applies to CEQA [(California Environmental Quality Act)], as the attached CEQA analysis makes clear. For the Town to move forward with your project we will need to conduct an Initial Study and to work with you to bring your project within the parameters of a possible Mitigated Negative Declaration.

"On both issues we are ready to work with you when you re-enter the process."

The Developer, through Ray Johnson, one of the principals, responded on July 1, 2004, with a letter to Robert Clark, the town manager, seeking clarification of Long's e-mail and requesting assurances that the Town would proceed with the Development Agreement. Clark responded that the Town and the Developer "need to resolve the FAA compliance issues as a prerequisite to . . . knowing whether [the hotel/condominium project] complies with FAA regulations. The need for the project to comply with FAA review requirements is specifically noted in Section 26 of the lease. The Town is ready to proceed working with you and the FAA to resolve the compliance concerns that exist at FAA on your project."

Through counsel, the Developer replied to Clark's letter on August 10, 2004. Counsel stated that "Clark and Long as authorized agents of the Town, now appear to believe that the Town may freely disregard the express terms of the Development Agreement and withhold approvals and other cooperation required by that Agreement to enable Hot Creek to proceed with its entitled development. As is more fully discussed hereafter, it is also apparent that the Town has affirmatively taken actions which threaten to directly undermine Hot Creek's prior contractual and statutory rights and promote other, more recent interests, such as the proposed expansion of commercial air service operations at the Airport."

On October 4, 2004, the FAA sent the Town a letter stating its concerns about grant assurances and raising objections to the residential nature of the hotel/condominium project. The letter stated: "We are concerned that the Town may be in violation of various [Airport Improvement Program] Grant Assurances, a situation that resulted from the Town executing a Development Agreement with Hot Creek Aviation. This situation will further aggravate if the Town proceeds to execute leases with Hot Creek Aviation for certain planned nonaeronautical development [at the airport]." (Fn. omitted.) The FAA informed the Town: "The Town has an obligation to act in accordance with the Airport Improvement Program (AIP) Grant Assurances. The Town needs to determine whether the proposed Hot Creek development is consistent with the Town initiative to extend the runway and expand the airfield infrastructure to accommodate commercial service by Boeing 757 type aircraft." (Fn. omitted.) The FAA informed the Town that its federal funding was in jeopardy.

In correspondence with the Developer, town officials professed willingness to work with the Developer to resolve the FAA issues. However, in private, the mood was not cooperative. Taking notes in a meeting of town officials discussing the October 4 FAA letter, an assistant town manager wrote: "Hammer Hot Creek—we will not approve an inconsistent project and we will renegotiate land disposal."

*Town's Default*

On February 7, 2005, the Developer served the Town with a notice of default under the Development Agreement. The notice demanded that the Town terminate its efforts to obtain federal funding for expansion inconsistent with the Development Agreement. The Town and Developer agreed to toll the notice of default while further negotiations were held. Although some progress was made, the FAA continued to insist that (1) the hotel/condominium project could not be used for permanent residences and (2) the purchase option was unacceptable because it might hinder future airport use of the land.

Town Manager Clark said to the FAA in a September 2005 e-mail: "Our lease contains an option for Hot Creek to purchase land under their condo hotel. I have advised them of the FAA's objection to the clause and asked to renegotiate. They indicate a very reluctant willingness to do so, but only when they have certainty as to their development rights and timing (which neither you nor I can deliver at this stage). I believe that the FAA and Town need to jointly investigate (with our respective legal counsels) what means we have to unilaterally eliminate this clause, along with the legal and financial implications of doing so." (Original underscoring.)

Also in September 2005, Town Manager Clark sent an e-mail to other town staff discussing "alternatives to eliminate the Hot Creek option." Two of the alternatives presented were to (1) seek declaratory relief in state or federal court or (2) condemn the purchase option and compensate the Developer. Concerning the value of the hotel/condominium purchase option, Clark stated: "Hot Creek estimates the market value of their project at $400 million, which is $1.6 million per unit based on fractional ownership, and the value of the option at 5% of sales price [($20 million)]. Even if the value is half that amount it would cost $10 million to acquire the option through negotiation. They offered to have a mutually agreeable expert determine the value. [¶] Since we don't have $10 to $20 million in spare change I am trying to come up with some other way to compensate Hot Creek." The Town did not pursue the eminent domain option.

In August 2006, Town Manager Clark informed the Developer that the town council's position was that the hotel/condominium project could not move forward until the FAA issues were resolved. The Developer's representative suggested that the Town could go forward with the hotel/condominium project under the Development Agreement and deal later with any FAA fallout, such as termination of funding from the FAA. Clark responded that the town council would not do that because it might derail approval of the expanded air service, which was very important to the council.

From the time Clark became the town manager in 2004, through 2006, Clark met in closed sessions many times with the town council concerning the issues arising from the Development Agreement. No council member ever told Clark that his actions or Long's actions were not authorized by the town council. Clark believed that all actions he took concerning the issues arising from the Development Agreement were either within his authority as town manager or with the authorization of the town council.

## PROCEDURE

The Developer filed a civil claim with the Town on September 1, 2006, for breach of the Development Agreement, asserting it had been damaged "in an amount not less than $150 million." After the Town rejected the claim, the Developer sued the Town, alleging a breach of contract cause of action. As remedies, the Developer sought damages, specific performance, and injunctive relief. Later, the Developer added a prayer for declaratory relief.

The Town demurred to the Developer's complaint. It asserted that, among other things, the Developer failed to exhaust administrative and judicial remedies pursuant to Code of Civil Procedure section 1094.5. The trial court overruled the demurrer.

The Town filed a motion for summary judgment. It argued, among other things, that the grant assurances made by the Town to the FAA were rules and regulations of the FAA as a matter of law and, therefore, the Development Agreement required compliance with the grant assurances. The trial court rejected this reasoning and concluded that whether the grant assurances were rules and regulations of the FAA was a factual matter to be submitted to the jury.

The Developer abandoned its prayers for specific performance and declaratory relief, so the action went to a jury trial on the Developer's claim for damages as a result of the Town's anticipatory breach of the Development Agreement.

The trial court instructed the jury concerning the breach of contract cause of action as follows:

"This case involves a dispute between the Town and the Hot Creek Developers. This is a breach of contract case arising out of a Development Agreement and a series of leases between the Town and the Hot Creek Developers that were executed in August of 1997. Generally speaking, the contract required the Hot Creek Developers to construct a series of improvements at the Mammoth-Yosemite Airport. In return, the Hot Creek

Developers received among other things the right to build and operate a hotel and residential condominium project on approximately 25 acres of land at the Airport and an option to purchase those 25 acres.

"The dispute in this case centers around whether the Town has breached the contract by refusing to allow the Hot Creek Developers to actually construct the hotel and residential condominium project. The Town denies that it has breached the agreement and maintains it stands ready to perform the contract. Your job as the jury is to resolve various factual disputes between the Hot Creek Developers and the Town as to what the parties intended when they agreed to certain contractual provisions, and various factual disputes as to whether a breach of contract has in fact occurred. In doing so, you will reach a conclusion as to whether or not the Town has breached the contract."

By special verdict, the jury found that (1) the Town and the Developer entered into a contract, (2) the Developer met all, or substantially all, its obligations under the contract, (3) the Town failed to perform under the contract or added extracontractual conditions to its performance, (4) the Developer did not waive the Town's failure to perform, and (5) the Town's failure to perform damaged the Developer. The jury set the amount of damages at $30 million.

On the Developer's motion, the trial court awarded the Developer $2,361,130 in attorney fees.

## DISCUSSION

### I

### *Availability of Contract Action*

The Town contends that the trial court erred by allowing the Developer to proceed with a contract action. The Town argues that the Developer was required to engage and exhaust the Town's administrative process before seeking judicial remedies. Based on this argument, the Town asserts that (1) the Developer's action is unripe because the Developer has not engaged and exhausted the available administrative process and (2), when the claim ripens, a petition for writ of administrative mandamus will be the exclusive judicial remedy.

The Town attempts to narrow the issue in its favor. Quoting selectively from the complaint, it states that the Developer's allegation is that "the Town 'failed and refused to . . . approve' the Developer's application for a

conditional use permit and subdivision map for the hotel/condominium project." If the dispute is simply about the failure to approve a conditional use permit and subdivision map, then it would appear that administrative mandamus is the remedy. However, the very paragraph of the complaint from which the quote is taken also contains six other allegations supporting the breach of contract cause of action.[2] As the Developer notes in response to the Town's argument, the theory presented to the jury was whether the Town breached the Development Agreement by refusing to proceed with the hotel/condominium project despite the FAA's objections to the project. Accordingly, we consider whether the anticipatory breach of the Development Agreement by the Town's refusal to proceed with the hotel/condominium project is unripe for judicial review because the Developer failed to exhaust administrative remedies.

The Town contends that the Developer could not file a complaint in court and thereby avoid the Town's administrative process for approving or rejecting land use applications. The contention is without merit because there was nothing for the Town's administrative process to adjudicate.

■ "This is the doctrine of 'exhaustion of administrative remedies.' In brief, the rule is that where an administrative remedy is provided by statute, relief must be sought from the administrative body and this remedy exhausted before the courts will act." (*Abelleira v. District Court of Appeal* (1941) 17 Cal.2d 280, 292 [109 P.2d 942].) "[E]xhaustion of the administrative remedy is a jurisdictional prerequisite to resort to the courts." (*Id.* at p. 293.) However, "[t]he exhaustion of administrative remedies doctrine has never applied where there is no available administrative remedy. [Citations.]" (*Tahoe Vista Concerned Citizens v. County of Placer* (2000) 81 Cal.App.4th 577, 590 [96 Cal.Rptr.2d 880].)

---

[2] The paragraph states: "The Town has breached the [Development Agreement] and Hotel/Condo Lease[] by[,] among other things, (1) failing and refusing to act on, or approve, the Hot Creek Developers [*sic*] development plans submitted to the Town in October 2000 and again in 2004; (2) taking actions to pursue other Airport expansion projects that could have the effect of depriving the Hot Creek Developers of the benefits of the [Development Agreement] and Hotel/Condo Lease; (3) misrepresenting and failing to disclose material facts to the Hot Creek Developers concerning FAA approval of the Hot Creek Project; (4) seeking the assistance of the FAA to create a pretext for the Town not to approve the Hot Creek Project; (5) breaching the [Development Agreement]'s express and implied covenants of good faith and fair dealing; (6) writing to the Hot Creek Developers on June 29, 2004, stating that the Town 'will be unable to move forward with your project,' and insisting on the performance of conditions by the Hot Creek Developers that are inconsistent with the [Development Agreement] and Hotel/Condo Lease; and (7) telling the Hot Creek Developers in 2005 and 2006 that the Town would not allow the project to move forward without conditions and continuing to require the Hot Creek Developers to give up valuable contract rights (including their purchase option) as a condition of moving forward with the project."

Here, there was no remedy available to the Developer in the administrative process. The Town concedes that relief pursuant to administrative mandamus would have been limited to a writ vacating a final decision by the town council on a land use application and that damages would not be available in such an action. However, once the Developer gave notice of default and the Town failed to cure the default, there was no longer a proposed land use to adjudicate in the Town's quasi-judicial administrative process. At that point, all that remained was to determine whether the Town breached the Development Agreement and, if it did, what was the remedy. No administrative remedy would have sufficed. (*Tahoe Vista Concerned Citizens v. County of Placer, supra,* 81 Cal.App.4th at p. 590.)

The Town cites two cases in support of its contention that the Developer failed to exhaust administrative remedies. Both are distinguishable.

The first case cited by the Town is *Legacy Group v. City of Wasco* (2003) 106 Cal.App.4th 1305 [131 Cal.Rptr.2d 460] (*Legacy Group*). In *Legacy Group*, a developer and a municipality entered into development agreements, as well as an agreement for the municipality to purchase infrastructure constructed by the developer. When the municipality stopped purchasing the infrastructure, the developer sued, asserting breach of contract, among other causes of action. The trial court entered judgment in favor of the municipality, finding that the action was barred by the statute of limitations applicable to actions implicating the Subdivision Map Act (Gov. Code, § 66410 et seq.). (106 Cal.App.4th at pp. 1307–1310.) In the published portion of the opinion on appeal, the court concluded that most of the allegations in the complaint did not implicate the Subdivision Map Act; therefore, the longer statute of limitations for contracts was applicable. The court stated: "[W]e are reluctant to extend [the Subdivision Map Act statute of limitations] to breach of contract claims unless the gravamen of the claim concerns acts that could have been challenged as a violation of the [Subdivision Map Act]." (106 Cal.App.4th at p. 1313.) Applying this holding, the court found that only one of the developer's breach of contract claims was subject to the shorter limitations period because the acts complained of "could have been challenged under the [Subdivision Map Act] . . . ." (*Id.* at p. 1314.)

Citing *Legacy Group*, the Town states: "The Developer's challenge to the Town's alleged failure and refusal to grant such discretionary approvals, even though pled as breach of contract, remained subject to the administrative exhaustion requirement and other restrictions on judicial relief applicable to such challenges."

The Town's argument relying on *Legacy Group* is unavailing for two reasons. First, it is premised upon the suggestion that the Developer's action

is all about the Town's failure to approve the Developer's land use application. We have already rejected that suggestion; therefore, attacking it does not show error as to the actual breach of contract allegations tried to the jury. And second, the Town's argument does not explain how the Developer, through the administrative process, could obtain the damages sought for the Town's breach of contract. Instead, as noted, the Town argues that those damages are unavailable.

The second case cited by the Town is *Subriar v. City of Bakersfield* (1976) 59 Cal.App.3d 175 [130 Cal.Rptr. 853] (*Subriar*). In *Subriar*, the plaintiff claimed that the municipality's requirements for obtaining a permit to operate an ambulance business were unconstitutional. The trial court agreed and granted a permanent injunction against enforcement of the ordinance. (*Id.* at pp. 180–181.) The appellate court, however, concluded that the plaintiff failed to exhaust his administrative remedies because, after the city manager failed to act on the permit, the plaintiff did not appeal to the city council to overturn the city manager's action. (*Id.* at p. 191.)

*Subriar* is distinguishable because an appeal to the town council could have resulted in issuance of the permit that the plaintiff sought. Here, engaging and exhausting the administrative process promised no prospect of obtaining damages for the Town's breach of the Development Agreement.

■ As tried to the jury, the Developer's complaint is not that the Town denied an application to build the hotel/condominium project. Instead, the complaint is that the Town refused to move forward on the hotel/condominium project, and refused to cooperate, until the FAA's concerns were resolved, which was not a condition in the Development Agreement. The administrative process for approving or rejecting land use applications was not designed to address this breach by the Town. Furthermore, having given the Town a notice of default, as allowed by the Development Agreement, the Developer elected not to pursue an application but instead to pursue damages for anticipatory breach. The administrative process could not give these damages. (*See Tahoe Vista Concerned Citizens v. County of Placer, supra*, 81 Cal.App.4th at p. 590 [exhaustion not required when process cannot provide requested relief].) Under these circumstances, the Developer was not required to submit a land use application to the Town and pursue the application through to denial by the town council.[3]

---

[3] The Town also contends that the Developer failed, as a matter of law, to establish futility of administrative review. Because we conclude that a breach of contract action was proper and administrative review could not provide an appropriate remedy, we need not consider further the contention that the Developer failed to establish futility.

### Availability of Contract Remedies

The Town contends that, if the trial court had required the Developer to pursue administrative remedies, the Developer's exclusive judicial remedy would have been a petition for administrative mandamus under Code of Civil Procedure section 1094.5. While this contention is theoretically correct, it is inapt and unhelpful to the Town because the Developer was legally entitled to go forward with a breach of contract action, as the trial court found.

■ Quasi-judicial determinations of a town council are reviewed judicially by administrative mandamus proceedings. (Code Civ. Proc., § 1094.5; *Mola Development Corp. v. City of Seal Beach* (1997) 57 Cal.App.4th 405, 410 [67 Cal.Rptr.2d 103].) Although, as the Town asserts, the Development Agreement preserved the Town's discretion to make quasi-judicial determinations with respect to applications submitted by the Developer as part of the development plan, the Town's refusal to move forward with the hotel/condominium aspect of the Development Agreement was not a quasi-judicial determination. Instead, it was an executive decision on the part of the Town to refuse to comply with the terms of the Development Agreement, ostensibly in order to preserve its funding from the FAA. Since the Developer did not challenge a quasi-judicial determination, administrative mandamus is not the exclusive remedy.

This is not to say that an action for contract damages is the only remedy for a municipality's breach of a development agreement. We are not faced, in this case, with an administrative mandamus challenge to a quasi-judicial determination of the town council. Instead, we conclude only that administrative mandamus is not the exclusive remedy, under the circumstances of this case, where there has been an anticipatory breach of the Development Agreement not involving a quasi-judicial determination.[4]

### II

### Contract Defenses

The Town contends that three clauses of the Development Agreement, each independently, provide a complete defense to the Developer's breach of

---

[4] In a footnote, the Town states as an alternative argument that the Developer was required to file a petition for traditional mandate because town officials refused to perform their ministerial duties under the contract. This argument was not raised below and is barely noted and undeveloped here. We need not consider this newly conceived footnote contention. (See *People v. Freeman* (1994) 8 Cal.4th 450, 482, fn. 2 [34 Cal.Rptr.2d 558, 882 P.2d 249] [issues mentioned but not developed as discrete contentions of error not properly raised]; Cal. Rules of Court, rule 8.204(a)(1)(B) [requiring appellant to state each point under a separate heading or subheading].)

contract action. We conclude that the three clauses do not provide a defense to the Town's breach of the Development Agreement.

Before we consider the three clauses, we summarize the law regarding interpretation of contracts.

■ "The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties." (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264 [10 Cal.Rptr.2d 538, 833 P.2d 545].) "A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." (Civ. Code, § 1636.) "The words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning; unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed." (Civ. Code, § 1644.)

■ "The interpretation of a written instrument, even though it involves what might properly be called questions of fact [citation], is essentially a judicial function to be exercised according to the generally accepted canons of interpretation so that the purposes of the instrument may be given effect. [Citations.] Extrinsic evidence is 'admissible to interpret the instrument, but not to give it a meaning to which it is not reasonably susceptible' [citations], and it is the instrument itself that must be given effect. [Citations.] It is therefore solely a judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence." (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839].)

### A. *Excuse Provision (Clause E)*

Section XVII(e) of the Development Agreement (clause E) stated that neither party would be in default for a cause beyond the reasonable control of the parties. It stated: "Neither party shall be in default of this Agreement for delays in or failures of performance due to war, insurrection, strikes, floods, earthquakes, fires, casualties, acts of God, *governmental restrictions imposed or mandated by governmental entities other than Town*, enactment of conflicting State or Federal laws or regulations, judicial decisions, or similar bases beyond the reasonable control of the party excused." (Italics added.)

The Town asserts that, as a matter of law, the emphasized portion of clause E excused it from performing on the Development Agreement because both

the Town and the Developer were required to comply with the FAA restrictions. This assertion is without merit because the FAA's restrictions were within the control of the Town.

The Town made grant assurances to the FAA in exchange for funding for the airport. And the FAA cited the grant assurances in insisting that the hotel/condominium project, with its residential character and option to purchase, was inconsistent with preserving the airport property for aeronautical purposes. If the Town had not made grant assurances in the first place and later encouraged the FAA to help the Town "get rid of" the hotel/condominium project, there would have been no impediment to the Town's performance of the Development Agreement with the Developer. The Town's own actions caused the FAA to express reservations concerning the hotel/condominium project. In other words, the FAA's restrictions were within the reasonable control of the Town. Therefore, the Town cannot rely on clause E to justify its nonperformance.

### B. *Rules and Regulations of the FAA (Clause N)*

Section XVIII(n) of the Development Agreement (clause N) required the parties to comply with FAA rules and regulations. It stated: "In carrying out this Agreement and otherwise operating the Airport in accordance with the terms of the leases, the parties shall comply with all applicable rules and regulations of the FAA."

In the trial court, the Town asserted that the grant assurances given to the FAA were FAA "rules" and, therefore, the Town's compliance with the grant assurances could not constitute a breach of the Development Agreement because the Development Agreement required compliance with FAA rules. The trial court rejected this assertion, concluding that there was a question of fact concerning the parties' intent with regard to clause N. It therefore submitted the question to the jury with the following instruction: "The Court has found, as a matter of law, that the grant assurances made by the Town to the FAA are not rules or regulations of the FAA. They are contractual promises made by the Town to the United States government in exchange for the federal funds the Town has received. However, a question of fact remains as to whether the parties intended the provision to include the Town's grant assurances."

On appeal, the Town contends that the grant assurances were FAA rules for the purpose of interpreting the Development Agreement and, therefore, the trial court improperly found otherwise, as a matter of law. We conclude that,

while grant assurances made by the Town to the FAA may be considered "rules" of the FAA by reference to federal statutes, the parties did not consider that definition when entering into the Development Agreement. The trial court properly instructed the jury to determine the parties' intent concerning the definition of FAA "rules."

Instead of focusing on the parties' intent as to the interpretation of clause N, the Town focuses solely on federal law with respect to whether grant assurances, in a technical sense, are "rules" of the FAA. The Town cites the broad definition of a "rule" in the federal Administrative Procedure Act, which includes "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy . . . ." (5 U.S.C. § 551(4).) The Town then notes that grant assurances (1) are " 'agency statements of general or particular applicability,' " (2) have " 'future effect,' " and (3) " 'implement, interpret [and] prescribe law.' " The Town also notes that federal law requires that, before the FAA can modify assurances or require compliance with additional assurances, it must give notice in the Federal Register and provide an opportunity for comment on the proposed change. (49 U.S.C. § 47107(h).)

█ Even if the grant assurances fall within the broad definition of a "rule" under the federal Administrative Procedure Act, the task of interpretation requires inquiry into the parties' intent, not into a proposed technical interpretation of the term. (Civ. Code, §§ 1636, 1644.) Because the court's task in interpreting a contract is to ascertain the intent of the parties, federal law concerning whether a grant assurance is technically a rule of the FAA is relevant only if the parties considered such federal law when they entered into the contract. There is no evidence that this was the case. Instead, the only evidence concerning the parties' intent in this regard came from the testimony of Terrence Ballas. He stated that the Town inserted the provision concerning FAA rules and regulations into the Development Agreement. When Ballas asked town officials what the provision meant, they stated that it was boilerplate applicable only to the "air-side operations of the airport." Ballas was hesitant to agree to clause N because he did not know what it included, so the parties went through the specific FAA rules applicable and included references to those rules in the various leases executed along with the Development Agreement. The Town never mentioned its grant assurances in this discussion. Thus, there is no evidence the parties intended to include the Town's grant assurances in the term "rules" in clause N of the contract.

Arguing against this interpretation, the Town states that (1) the FAA expressed the opinion that the grant assurances were FAA "rules" and the FAA's opinion is entitled to deference and (2) we should apply canons of

statutory interpretation, not contract interpretation, because the Development Agreement was a legislative act. The Town is wrong on both points.

In one of the letters to the Town concerning the Town's compliance with the grant assurances, an FAA official stated: "We view the Town's ability to take corrective action to be fully within the scope of paragraph N of Section XVIII of the Development Agreement, which clarifies the Town's obligation to comply with FAA rules and regulations." Citing authority that courts give deference to an agency's interpretation of a statute if that statute governs the agency's powers and responsibilities (*Ste. Marie v. Riverside County Regional Park & Open-Space Dist.* (2009) 46 Cal.4th 282, 292 [93 Cal.Rptr.3d 369, 206 P.3d 739]), the Town claims that we should give deference to this opinion. To the contrary, the FAA has no authority over development agreements and no special expertise in contract interpretation.

The Town also argues that, because adoption of the Development Agreement was a legislative act (Gov. Code, § 65867.5, subd. (a)), we are required to apply canons of statutory interpretation. This argument misconstrues the "legislative act" language of the development agreement statutes, which applies to the authority of the municipality to enter into the agreement and the power of the electorate to challenge the agreement by referendum.

■ "A development agreement is a legislative act that shall be approved by ordinance and is subject to referendum." (Gov. Code, § 65867.5, subd. (a).) A development agreement is treated as a legislative act for the purpose of a challenge to the agreement either (1) by referendum or (2) an action concerning the municipality's authority to enter into the agreement. In *SMART, supra,* 84 Cal.App.4th at pages 227 and 228, the court summarized the effect of the "legislative act" language. It said: "A development agreement is a legislative act ([Gov. Code,] § 65867.5) and the County's board of supervisors has the discretion to determine what legislation is necessary and appropriate. A reviewing court will not set aside a legislative act unless it is arbitrary, capricious, or unlawful."

Here, the question does not concern the validity of the Development Agreement as a legislative act of the Town. Instead, this is an action between the parties of the Development Agreement concerning the interpretation of the agreement. As to that question, the Development Agreement is a contract between the parties. Therefore, canons of statutory interpretation do not apply.

### C. *Acknowledgement of FAA Funding (Clause B)*

Section XVI(b) of the Development Agreement (clause B) required the Developer to match FAA funding. It stated: "[The] Town has received tentative

commitments from the FAA for grant funds . . . for the purpose of constructing improvements at the Airport . . . . The terms of the grant require that matching funds in the approximate amount of ten percent (10%) of the grant funds be put up by [the] Town. As further consideration for this Agreement, Developer agrees to and shall provide such matching funds . . . ." Within one month after adoption of the Development Agreement, the Developer supplied $80,000 in matching funds.

"A voluntary acceptance of the benefit of a transaction is equivalent to a consent to all the obligations arising from it, so far as the facts are known, or ought to be known, to the person accepting." (Civ. Code, § 1589.) The Town argues that the Developer's acknowledgement of FAA funding and participation in matching the funding amounted to a consent to the FAA's restrictions. This argument fails because there is no evidence that, when entering into the Development Agreement, or even when supplying the matching funds, the Developer knew or ought to have known of the grant assurances. Instead, the evidence showed that the Town withheld from the Developer knowledge of the FAA's reservations concerning the Development Agreement. Under these facts, the Developer did not consent to the grant assurances.

III

*Proof of Breach*

The Town contends that the Developer failed, as a matter of law, to establish that the Town breached the Development Agreement. Stated differently, the Town contends that there is no substantial evidence to sustain the jury's verdict. The Town asserts (A) the Developer failed to establish a breach attributable to the Town; (B) the evidence was insufficient to establish repudiation; (C) the option was a unilateral contract not yet ripe for breach; and (D) the Town retracted any repudiation. After summarizing the law regarding substantial evidence to sustain the verdict finding anticipatory breach of contract, we discuss the Town's four arguments and conclude that each is without merit.

When we consider whether the evidence was sufficient to support the jury's verdict, we review the entire record in the light most favorable to the judgment to determine whether there are sufficient facts, contradicted or uncontradicted, to support the judgment. (*Campbell v. Southern Pacific Co.* (1978) 22 Cal.3d 51, 60 [148 Cal.Rptr. 596, 583 P.2d 121].) Substantial evidence is evidence that is reasonable and credible. In evaluating the

evidence, we accept reasonable inferences in support of the judgment and do not consider whether contrary inferences may be made from the evidence. (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1632–1633 [29 Cal.Rptr.2d 191].)

■ To recover on a cause of action for breach of contract, the plaintiff must establish (1) the existence of a contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) damage to plaintiff as a result of defendant's breach. (*Regan Roofing Co. v. Superior Court* (1994) 24 Cal.App.4th 425, 434–435 [29 Cal.Rptr.2d 413], disapproved on another ground in *Crawford v. Weather Shield Mfg., Inc.* (2008) 44 Cal.4th 541, 565 [79 Cal.Rptr.3d 721, 187 P.3d 424].)

■ "Anticipatory breach occurs when one of the parties to a bilateral contract repudiates the contract. The repudiation may be express or implied. An express repudiation is a clear, positive, unequivocal refusal to perform [citations]; an implied repudiation results from conduct where the promisor puts it out of his power to perform so as to make substantial performance of his promise impossible [citations].

"When a promisor repudiates a contract, the injured party faces an election of remedies: he can treat the repudiation as an anticipatory breach and immediately seek damages for breach of contract, thereby terminating the contractual relation between the parties, or he can treat the repudiation as an empty threat, wait until the time for performance arrives and exercise his remedies for actual breach if a breach does in fact occur at such time. [Citation.] However, if the injured party disregards the repudiation and treats the contract as still in force, and the repudiation is retracted prior to the time of performance, then the repudiation is nullified and the injured party is left with his remedies, if any, invocable at the time of performance. [Citations.]" (*Taylor v. Johnston* (1975) 15 Cal.3d 130, 137–138 [123 Cal.Rptr. 641, 539 P.2d 425].)

As the jury was instructed in this case, "[a] party can breach, or break, a contract before performance is required by clearly and positively indicating, by words or conduct, that they [*sic*] will not or cannot meet a requirement of the contract, or that they [*sic*] will not perform until additional conditions not in the contract are met. [¶] If the Hot Creek Developers prove that they would have been able to fulfill the terms of the contract and that the Town clearly and positively indicated, by words or conduct, that it would not or could not meet a requirement in the contract, then the Town breached the contract."

The Developer's theory of breach, upon which it prevailed at trial, was that the Town expressly repudiated the Development Agreement by refusing to move forward on the contract without resolving the FAA's objections to the Hot Creek Project.[5]

### A. Breach Attributable to Town

A 1989 resolution of the Mammoth Lakes town council states that "no oral or written communications or comments . . . by any member of the Town Council or any other person constitutes an action of the Town Council or an act legally attributable to the Town . . . ."[6] Based on this resolution, the Town claims that the actions of town officials in repudiating the Development Agreement cannot be attributed to the Town. To the contrary, the actions of town officials were an actionable repudiation of the Development Agreement.

The Developer presented evidence that Deputy Town Manager Long and, later, Town Manager Clark stated, unequivocally, that the Town would not proceed with the hotel/condominium project until the FAA's objections to the project were resolved. Long informed the Developer that, until the FAA's objections were resolved, "we will be unable to move forward with your project." Later, Clark again informed the Developer that the project would not move forward without resolution of the FAA's objections. When the Developer requested that the Town proceed under the Development Agreement and deal with the FAA's objections later, Clark said that the town council would not agree to proceeding that way because it might derail FAA approval of expanded air service. The Town offered no evidence to counter the Developer's evidence that the town council authorized the position taken by Long and Clark.

Despite this evidence, the Town maintains that any repudiation by town officials was without force because the town council did not vote on it. We disagree. Neither the Town's resolution nor case law concerning the authority

---

[5] The Developer asserts that the Town breached the contract when it failed to provide requested assurances that it would meet its obligations under the contract. The Developer claims it is "hornbook law that the failure to provide reasonably requested assurances is a repudiation. [Citations.]" This assertion fails on appeal, however, because this theory was not presented to the jury by instructions at trial. (*Daniels v. San Francisco* (1953) 40 Cal.2d 614, 623 [255 P.2d 785] [appellate court cannot affirm based on theory not presented to jury].)

[6] Section four of Resolution 89-41 of the town council of Mammoth Lakes states: "The Town Council acts on behalf of the Town of Mammoth Lakes only by motion, resolution or ordinance duly adopted at a duly noticed meeting of the Town Council. Except for such a motion, resolution or ordinance, no oral or written communication or comments during the course of any Town Council meeting or at any other time by any member of the Town Council or any other person constitutes an action of the Town Council or an act legally attributable to the Town of Mammoth Lakes."

of municipal officials absolves the Town of liability for its repudiation, even if accomplished through its officials rather than by a vote of the town council.

■ "No government, whether state or local, is bound to any extent by an officer's acts in excess of his authority. [Citation.] [¶] One who deals with the public officer stands presumptively charged with a full knowledge of that officer's powers, and is bound at his peril to ascertain the extent of his powers to bind the government for which he is an officer, and any act of an officer to be valid must find express authority in the law or be necessarily incidental to a power expressly granted. [Citation.]" (*Horsemen's Benevolent & Protective Assn. v. Valley Racing Assn.* (1992) 4 Cal.App.4th 1538, 1563–1564 [6 Cal.Rptr.2d 698].)

Citing the town council's 1989 resolution, the Town asserts that the town officials had no authority to act on behalf of the Town. The Town states: "This Resolution could not be more plain: Individual town officials, including then-Deputy Town Manager Long, have no authority to take final action on behalf of the Town, and their written communications, including Mr. Long's June 29 Email, are not legally attributable to the Town." This assertion reads too much into the resolution. Taken to its logical extreme, this assertion would mean that town officials cannot buy paper clips on behalf of the Town without a vote of the town council.

■ We must presume the town council did not intend an absurd result. (*California School Employees Assn. v. Governing Board* (1994) 8 Cal.4th 333, 340 [33 Cal.Rptr.2d 109, 878 P.2d 1321] [legislation interpreted to avoid absurd results].) A more reasonable interpretation of the resolution is that consistent with case law, which holds that the legislative and quasi-judicial powers of a municipality's governing council cannot be undermined by statements of municipal officials. (See, e.g., *Katsura v. City of San Buenaventura* (2007) 155 Cal.App.4th 104, 109 [65 Cal.Rptr.3d 762] [oral contract made by city employee not binding on city]; *Burchett v. City of Newport Beach* (1995) 33 Cal.App.4th 1472, 1479 [40 Cal.Rptr.2d 1] [statement of city official that owners could obtain permit not binding on city].) The town council adopted the Development Agreement by ordinance. Logically and legally, the fulfillment of the Town's duties under the Development Agreement was left, for the most part, to town officials. Any other conclusion would allow a municipality to repudiate any contract by the actions of its officials and suffer no consequences unless the governing council voted to repudiate.

■ In any event, ·the Town's municipal code gives further guidance concerning the authority of town officials and supports a finding here that the town officials acted within their authority. The executive functions of the

Town, including cooperation with parties that have contracted with the Town, are within the authority of the town manager. According to the Town's municipal code, the town manager is an executive officer, charged with the duty to "see that all franchises, contracts, permits and privileges granted by the town council are faithfully observed." (Mammoth Lakes Municipal Code, § 2.08.060, subd. A.) Therefore, compliance with the Town's duty to cooperate under the Development Agreement was within the explicit authority of the town manager. And the refusal of the town manager and deputy town manager to cooperate without resolution of the FAA's objections was a repudiation of the contract.

Again raising the argument that this was a land use decision instead of a matter of complying with the terms of the Development Agreement, the Town asserts that a town official cannot bind the Town by representations concerning land use applications. While the proposition may be true as a theoretical statement of law (see *Burchett v. City of Newport Beach, supra*, 33 Cal.App.4th at p. 1479), it is inapplicable here. The repudiation of the contract did not result from a quasi-judicial decision on a land use application. As noted above, the repudiation occurred when the Town refused to comply with the terms of the Development Agreement to cooperate with the Developer to achieve the ends of the Development Agreement. While it is true that quasi-judicial decisions on land use applications remained to be made before the hotel/condominium project could be completed, the Town's position, related through town officials, was that the Town would not cooperate with the Developer in moving along the hotel/condominium project without resolution of the FAA's objections. That refusal constituted the breach, not the exercise of any quasi-judicial decisionmaking power.[7]

### B. *Evidence of Repudiation*

 The Town contends that the Town's actions did not constitute a repudiation of the Development Agreement. To the contrary, when viewed in the light most favorable to the judgment, the evidence was sufficient to establish an express repudiation. While claiming a willingness to move

---

[7] At the end of its opening brief argument that the Developer failed to establish a breach attributable to the Town, the Town appends a two-sentence assertion that the trial court "compounded its prejudicial error" by not instructing the jury using a Town-proposed jury instruction modeled after Resolution 89-41. This assertion makes no sense because the error of which the Town complains is lack of sufficient evidence, not some prejudicially erroneous action of the trial court. Because the Town makes no separate contention, supported by authority and analysis, that the jury was misinstructed, we need not consider further this statement in the opening brief. (See *People v. Freeman, supra*, 8 Cal.4th at p. 482, fn. 2; Cal. Rules of Court, rule 8.204(a)(1)(B).)

forward with the hotel/condominium project, town officials actually refused to move forward and actively sought to undermine the Developer's rights under the contract.

 "[I]f a party to a contract expressly or by implication repudiates the contract before the time for his or her performance has arrived, an anticipatory breach is said to have occurred. [Citations.] The rationale for this rule is that the promisor has engaged not only to perform under the contract, but also not to repudiate his or her promise. [Citation.]" (*Romano v. Rockwell Internat., Inc.* (1996) 14 Cal.4th 479, 489 [59 Cal.Rptr.2d 20, 926 P.2d 1114].) "An express repudiation is a clear, positive, unequivocal refusal to perform. [Citations.]" (*Taylor v. Johnston, supra,* 15 Cal.3d at p. 137.) "Annexing an unwarranted condition to an offer of performance is a refusal to perform. [Citation.]" (*Steelduct Co. v. Henger-Seltzer Co.* (1945) 26 Cal.2d 634, 646 [160 P.2d 804].)

Here, the Town refused to perform the Development Agreement without prior satisfaction of an unwarranted condition. But the Town asserts that the way it responded to the Developer's demands to perform the Development Agreement did not amount to a repudiation for three reasons: (1) compliance with FAA rules and regulations was mandated by the Development Agreement in clause N, (2) the Town offered to perform the Development Agreement according to its own good faith interpretation of the agreement, and (3) the Town demonstrated its intention to be bound by the Development Agreement. In connection with this argument, the Town also claims that (4) the trial court erred by allowing the jury to find that the Town repudiated the Development Agreement by entering into inconsistent contracts.

### 1. *Compliance with FAA Rules and Regulations*

We have already rejected the Town's first argument. Clause N, relating to FAA rules and regulations, was inapplicable to the grant assurances the Town made to the FAA.

### 2. *Good Faith Interpretation of Contract*

The Town's second argument fails because the theory was not proffered to the jury and the evidence, properly viewed on appeal, does not support it. The Town cites a federal court opinion for the proposition that, as long as a party to a contract offers to perform a contract according to its own good faith understanding of the contract, there is no repudiation, even if the party's understanding is incorrect. (*Pacific Coast Engineering Co. v. Merritt-Chapman & Scott Corp.* (9th Cir. 1969) 411 F.2d 889, 894.) Citing other federal authority, the federal court stated: "Generally, when there is a

disagreement as to the meaning of terms in a contract, one party's offer to perform in accordance with his interpretation is not itself an anticipatory breach. *Lowenstein v. Federal Rubber Co.*, 85 F.2d 129 (8 Cir. 1936). If the offer appears to be made in the good faith belief that the offeror's interpretation is correct, that will be evidence of his continued adherence to the agreement. *Mobley v. New York Life Insurance Co.*, 295 U.S. 632, 638 [79 L.Ed. 1621, 55 S.Ct. 876] (1935); *Kimel v. Missouri State Life Insurance Co.*, 71 F.2d 921, 923 (10 Cir. 1934); *Milton v. H. C. Stone Lumber Co.*, 36 F.2d 583, 588 (S.D.Ill. 1928), affirmed 36 F.2d 589 (7 Cir. 1929)." (*Pacific Coast Engineering Co. v. Merritt-Chapman & Scott Corp., supra*, 411 F.2d at p. 894.)

■ We reject the Town's reliance on this defense of good faith contract interpretation because the Town did not proffer this theory to the jury. (*See Panopulos v. Maderis* (1956) 47 Cal.2d 337, 340–341 [303 P.2d 738] [party may not raise new theory on appeal]; *Durkee v. Chino Land & Water Co.* (1907) 151 Cal. 561, 569 [91 P. 389] [defendant cannot raise new theory of defense on appeal].) In any event, the evidence does not support the Town's claim that it desired to comply with the Development Agreement in good faith. While asserting that the Town was willing to abide by the terms of the Development Agreement, town officials were actively working with the FAA to terminate the Developer's right under the Development Agreement to build the hotel/condominium project.

### 3. *Intent to Be Bound by Contract*

Likewise, the Town's third argument also fails because it is not supported by the evidence, properly viewed. The Town demonstrated its intention not to be bound by the Development Agreement. It actively refused to cooperate and sought to have the Developer's rights terminated.

### 4. *Repudiation Based on Inconsistent Contracts*

The related argument that the trial court erred by allowing the jury to find that the Town repudiated the Development Agreement by entering into inconsistent contracts finds no support in the record.

The Town states: "The trial court committed prejudicial error for a number of reasons when it directed the jury to make a finding on an inapposite theory of 'inconsistent contracts,' under which the Town could be found liable for repudiating the [Development Agreement] by virtue of having accepted federal airport funding and thereby subjected itself to FAA's grant assurance requirements."

A more careful reading of the jury instruction at issue reveals that the court did not allow the jury to base a finding of repudiation on the Town's formation of inconsistent contracts. Instead, the instruction merely informed the jury that a party cannot rely on its assent to one contract to justify breach of another, inconsistent contract.[8] That is not a theory of liability; instead, it is a limitation on a defense. Therefore, contrary to the Town's assertion, the jury was not directed to base a finding of repudiation on a theory of inconsistent contracts.

### C. Breach of Unilateral Contract

The Town contends that the Developer's argument that the Town repudiated the purchase option for the land on which the hotel/condominium project would be built fails as a matter of law because a purchase option is a unilateral contract to which the theory of anticipatory breach does not apply. (See *Diamond v. University of So. California* (1970) 11 Cal.App.3d 49, 53 [89 Cal.Rptr. 302] [anticipatory repudiation does not apply to unilateral contracts].) This is simply an attempt by the Town to recharacterize the action as one for breach of the purchase option rather than breach of the Development Agreement—a red herring designed to divert attention away from the applicable theory of recovery. The attempt is unsuccessful. The theory proffered to the jury was that the Town repudiated the Development Agreement, not just the purchase option. And the Town makes no attempt to establish that the Development Agreement was a unilateral contract.

### D. Evidence of Retraction of Repudiation

The Town argues that, even if deputy town manager Long's June 29, 2004 e-mail can be considered a repudiation of the Development Agreement, Town Manager Clark's letter two weeks later retracted the repudiation. (See *Sackett v. Spindler* (1967) 248 Cal.App.2d 220, 231–232 [56 Cal.Rptr. 435] [repudiation nullified if timely retracted].) However, Clark's letter is not a clear retraction. While it professes the Town's willingness to work with the Developer on FAA compliance issues, it does not offer to move forward with the hotel/condominium project without first resolving FAA compliance issues.

Halfway through the single paragraph in the Town's opening brief arguing that it retracted any repudiation of the Development Agreement, the

---

[8] The court instructed: "There are times when a party enters into two inconsistent or mutually exclusive contracts. This occurs when performance of one contract will by necessity require a breach of the other contract. In those circumstances, it is not an excuse to performance of one contract that the party chose to perform the other contract."

Town claims that the trial court also erred by not instructing the jury on retraction. We need not consider this separate argument appended as it is to another argument. (Cal. Rules of Court, rule 8.204(a)(1)(B).) ▮ In any event, the Town fails to provide a citation to the record where the Town requested what it contends would have been a proper instruction on retraction. (*Null v. City of Los Angeles* (1988) 206 Cal.App.3d 1528, 1535 [254 Cal.Rptr. 492] [to complain of failure to instruct, party must have requested proper instruction].) Therefore, the Town forfeited review of this issue on appeal.

IV

*Damages Award*

After obtaining many benefits from the Development Agreement, including the Developer's airport improvements, the Town repudiated the Development Agreement. The jury awarded the Developer $30 million for the breach. On appeal, the Town contends that evidence of damages was too speculative to support the jury's award. We conclude that the evidence was not too speculative to support the jury's award.

▮ " 'Where the prospective profits are the natural and direct consequences of the breach of the contract they may be recovered. Profits are part and parcel of the contract itself, entering into and constituting a portion of its very element; something stipulated for, the right to the enjoyment of which is just as clear and plain as to the fulfillment of any other stipulation. They are presumed to have been taken into consideration and deliberated upon before the contract was made, and formed, perhaps, the only inducement to the arrangement. [Citation.] Damages consisting of the loss of anticipated profits need not be established with certainty. It is sufficient that it be shown as a reasonable probability that the profits would have been earned except for the breach of the contract. [Citations.]' " (*Nelson v. Reisner* (1958) 51 Cal.2d 161, 171–172 [331 P.2d 17], quoting *James v. Herbert* (1957) 149 Cal.App.2d 741, 749 [309 P.2d 91].)

Under this standard, we must determine whether the Developer presented evidence sufficient to establish a reasonable probability that it would have realized a $30 million profit on the hotel/condominium project if the Town had not breached the Development Agreement. In this inquiry, we construe the evidence in the light most favorable to the judgment. We draw every reasonable inference and resolve every conflict in support of the judgment. (*Campbell v. Southern Pacific Co., supra*, 22 Cal.3d at p. 60.)

A. *Evidence of Damages*

1. *Town Manager's Estimate of Value of Purchase Option*

As noted in the facts above, Town Manager Clark wrote an e-mail to town staff in which he noted that the Developer valued the purchase option at about $20 million. Even with the prospect of litigation over the Town's breach of the Development Agreement, Clark appears to have rejected the alternatives of eminent domain proceedings or negotiations with the Developer because the Town, in Clark's words, did not have "$10 to $20 million in spare change." In testimony at trial, Clark said that town officials "didn't know how much it would cost, but we speculated it would be in that range."

2. *Part-owner's Estimate of Value*

During the trial, Mark Rosenthal, one of the investors in the Developer, testified. Rosenthal was president of a company that participated in various real estate ventures, including as developer, manager, and owner. His experience included development or redevelopment of several hotels. When determining whether to purchase an interest in the hotel/condominium project, Rosenthal considered strategies to eventually exit the investment. He believed that the hotel/condominium project could be sold for $30 million to $40 million if the uncertainties with the Town and the Development Agreement were cleared up.

3. *Expert Evidence Concerning Value of the Hotel/Condominium Project in 2004*

The bulk of the evidence concerning damages came from Richard Maurice Robinson, an expert retained by the Developer. Robinson is a certified general real estate appraiser and has 20 years of experience in appraising hotels and resorts. He consults with municipalities to bring in high-end hotels. In this process, he customarily makes projections concerning the cost and profit of such hotels. He teaches complex valuation techniques at the University of California, Berkeley.

Based on the plans for the hotel/condominium project and the bids from architectural and construction companies, Robinson assumed that it would cost about $168 million to build the hotel/condominium project. In addition to the architectural and construction costs, Robinson estimated that the Developer would incur costs of about $45 million for sales and about $9 million for financing. Thus, his estimate for the total cost of the project was about $220 million.

Robinson also estimated the amount of income to be generated by the project. After studying other similar projects, he calculated a likely price at which the individual units would sell if marketed, as the Developer intended, as a residential development. He added a premium to the price for the advantages of this particular property, but then he discounted the price by 30 percent because of its location at the airport. After taking into account other characteristics of the project, such as the fractional (timeshare) nature of the sales, the intent to associate with a major brand, and the pace at which the units would sell, Robinson estimated a total selling price of $350 million for the entire project.

Subtracting the cost of the project from the income to be generated from the sale of the condominium units, Robinson projected a total of about $130 million in profit over the life of the project.

In addition to this projected net profit from the sale of the condominium units, Robinson estimated that, once the project was fully built and stabilized, it would generate $2.2 million net income per year from the Developer's management of the property, including renting units out when the owners were not occupying them. He arrived at this number using industry standards and guidelines for this type of valuation and rental conditions specific to the Mammoth area.

Robinson concluded that, over the life of the project, the hotel/condominium would result in about $160 million in total profits for the Developer. To arrive at a current ("current" meaning 2004, when the Town breached the Development Agreement) value of the hotel/condominium project, Robinson factored in the risks of eventually realizing that profit from a project that had not yet been built. Having done so, Robinson estimated that the 2004 value of the hotel/condominium project was $37 million to $48 million.

### 4. *Order Denying Motion for New Trial*

After the jury's verdict awarding $30 million to the Developer, the Town moved for a new trial, asserting, among other things, that the evidence did not support the damages award. The trial court denied the motion. However, in doing so, the court stated: "[W]ere the question of damages predicated solely on the testimony of Mr. Robinson, I would grant a motion for new trial based on the issue of damages, not only for the issues outlined by [counsel for the Town] but also other concerns I had at the time as the testimony came in. However, as is pointed out by [counsel for the Developer], an owner of the property can opine a value of property, and although Mr. Rosenthal did insert a caveat in his discussion of the sale on the order of $30 [million] to

$40 million, there was enough basis with that and the various and sundry assessments made by the Town itself as to a condemnation value to justify a jury verdict. So although I would have reached a different verdict, that is not the standard I use, and I do not find there was a basis, therefore, for setting aside the damages award. So the motion for new trial will be denied."

B. *Analysis*

1. *Sufficiency of Evidence*

Before we consider the Town's contention that the evidence of lost profits was too speculative, we must address an argument by the Town concerning the presumption that the verdict is correct. The Town asserts that the trial court's comments on the evidence of damages made during the hearing on the motion for new trial are significant on appeal. The court stated that it would have granted the motion for new trial had Robinson's testimony been the only evidence of damages. The Town claims that the court's comments are entitled to "substantial deference." That is incorrect. We defer to the trial court's factual determination when the court grants a motion for new trial, not when the court denies such a motion. When the court denies the motion, we presume the jury's verdict is correct. (See *Lane v. Hughes Aircraft Co.* (2000) 22 Cal.4th 405, 412 [93 Cal.Rptr.2d 60, 993 P.2d 388] [presumption of verdict's correctness replaced by deference to trial court's factual determinations when court grants motion for new trial].)

The Town asserts that the evidence does not support a $30 million damages award.[9] Concerning the expert testimony from Robinson, the Town contends that his opinion of the 2004 value of the hotel/condominium project was too speculative and fails to support the jury's $30 million damages verdict because Robinson's calculations involved too many assumptions and contingencies. To the contrary, despite the assumptions and contingencies stated in Robinson's testimony, the evidence was sufficient to show a reasonable probability that the profits would have been realized except for the breach of the Development Agreement. (See *Nelson v. Reisner, supra*, 51 Cal.2d at pp. 171–172.)

The Town argues that Robinson made the following assumptions: (1) all necessary permits would be obtained, (2) environmental review would be completed, (3) estimated construction costs provided by the Developer were accurate, (4) the project would be built within the estimates, (5) the

---

[9] The Town attacks the Developer for mentioning that the Developer spent $15 million to $17 million on airport improvements. The Town asserts that the Developer has been able to profit from those improvements. To be clear, the Developer is not claiming the $15 million to $17 million expended on airport improvements as damages in this case.

Developer would successfully obtain financing, (6) the Developer would successfully associate with a major brand, and (7) the mix of project units could be sold within the timeframe and at projected prices.

The assumptions used by Robinson were intentionally conservative. They were reasonable, based on Robinson's knowledge of the industry and experience in valuing hotel projects. ((1) & (2).) The necessary permits and environmental review were simply a matter of forging onward with the project. There is no evidence that the Developer could not obtain the permits and review. ((3) & (4).) The estimated costs of construction were based on actual bids submitted to the Developer. (5) There was evidence that the Developer was in the process of successfully obtaining the required financing. (6) Robinson testified that associating with a major brand would not be hard, saying "[b]rands love these projects." And (7), concerning the timeframe for selling all the units, Robinson looked at the rate at which similar properties sold and then reduced it to give a conservative estimate of seven years. This evidence, though predictive, was not speculative.

The Town attacks the discounting of the total estimated profits ($160 million) to determine a current (2004) value of the project ($37 million to $48 million). It contends that this process merely "applied *additional* speculative assumptions on top of Robinson's flawed lost profits projections." (Original italics, fn. omitted.) The Town cites *Parlour Enterprises, Inc. v. Kirin Group, Inc.* (2007) 152 Cal.App.4th 281 [61 Cal.Rptr.3d 243] (*Parlour Enterprises*) to support this contention. Neither the contention nor the citation to *Parlour Enterprises* is persuasive.

Robinson applied accepted valuation principles, factoring in the risks associated with a project yet to be undertaken and reducing the profits projected to be earned over the life of the project to arrive at a current value. The Town's labeling of the accepted practice as including "speculative assumptions" is insufficient to establish that Robinson's estimate of current value was unreasonable.

In *Parlour Enterprises*, the appellate court reversed the bulk of damages awarded in favor of a franchisor who sued a franchisee for failure to open ice cream parlors as required by their agreement. (*Parlour Enterprises, supra*, 152 Cal.App.4th at pp. 283–284.) The court's opinion does not reveal the extent of the experience and expertise of the franchisor's damages expert. In any event, the appellate court noted that the franchisor's profit projections formed the basis for the expert's analysis. (*Id.* at p. 285.) Those projections, however, were unsupported by the evidence. There was no evidence that whoever made the projections had experience or expertise in predicting income, expenses, or profits. (*Id.* at pp. 289–290.)

Here, unlike in *Parlour Enterprises*, there was evidence to support the projections given to and the assumptions made by Robinson. The costs to build the project were based on bids and standard costs. And the potential sales were based on comparable developments, with the sales adjusted down because of the specific characteristics of this project. Therefore, *Parlour Enterprises* is distinguishable because Robinson's testimony was based on professional expertise developed over two decades of hotel and resort valuation, as well as reliable evidence and assumptions.

■ The Town also argues that Robinson's testimony concerning the current value of the project is insufficient to support the verdict because there was no evidence that a willing buyer existed. Such evidence, however, is unnecessary to support a damages award in this context. Lost profits may be proved by means other than the value given by a willing buyer. Expert testimony, alone, may be sufficient if it is supported by substantial evidence and is not speculative. (*Kids' Universe v. In2Labs* (2002) 95 Cal.App.4th 870, 885 [116 Cal.Rptr.2d 158].)

Robinson testified at length concerning the discount of the lost profits to estimate a current value. In order to induce a buyer to take on the risks of an unfinished project—risks such as cost overruns, slow sales, or a drop in prices—it would be necessary to set a current value well below the amount of lost profits over the life of the project. Robinson testified concerning the risks and discounts associated with those risks. While he did not testify that there was a ready and willing buyer, he confirmed that the discounted price was a price, in his experience, that "somebody would pay."

Therefore, Robinson's testimony, giving the project a current value of $37 million to $48 million, was sufficient to sustain the $30 million damages award. But his was not the only testimony concerning damages.

As did the trial court, we recognize that evidence concerning the amount of damages came from the town manager and one of the Developer's investors. However, the Town asserts that the evidence from those sources also does not support the $30 million damages award. We disagree. The testimony from the investor supports the award, and the evidence of the town manager's statement supports the award to the extent of the statement ($20 million).

■ An owner of property is generally considered competent to estimate or offer a lay opinion of the property's value. (Evid. Code, § 813, subd. (a)(2); *Sacramento & San Joaquin Drainage Dist. v. Goehring* (1970) 13 Cal.App.3d 58, 64 [91 Cal.Rptr. 375].) "In stating an opinion as to the value of his property, an owner is bound by the same rules of admissibility as is any

other witness. [Citation.]" (*Sacramento & San Joaquin Drainage Dist., supra,* at p. 65.)

Rosenthal was experienced in developing, managing, and owning real estate and had developed and redeveloped hotels. As a part-owner of the Developer, he expressed his opinion that, based on his experience and his review of the hotel/condominium project, the project could be sold for $30 million to $40 million. This evidence supported the jury's verdict.

Finally, the town manager apparently agreed with a statement that the purchase option, alone, was worth $10 million to $20 million. This was also evidence that had a tendency to prove the value of the project. Although it may not have been sufficient by itself to support the damages award, it helped to establish the reasonableness of the rest of the evidence concerning the value of the project.

Accordingly, we conclude that there was substantial, nonspeculative evidence that the Developer sustained $30 million in damages as a result of the Town's breach of the Development Agreement.

### 2. *Forfeiture of Taxpayer Funds*

In an argument raised for the first time in its reply brief, the Town claims that the damage award amounts to an invalid forfeiture of taxpayer funds. The Town forfeited this argument by failing to raise it in a timely manner. (*Murray Co. v. Occupational Safety & Health Appeals Bd.* (2009) 180 Cal.App.4th 43, 54, fn. 5 [102 Cal.Rptr.3d 513].)

V

### *Attorney Fees*

After judgment was entered, the trial court ordered the Town to pay the Developer $2,361,130 in attorney fees based on a provision of the Development Agreement providing for attorney fees to the prevailing party in a legal action. The Town separately appealed the attorney fees award.

The Town states that, if we reverse the judgment in favor of the Developer, we must also reverse the attorney fees award, which was based on the Developer's status as the prevailing party. Because we affirm the judgment, and the Town makes no argument for reversing the attorney fees award other than reliance on reversal of the judgment, we also affirm the award of attorney fees.

## DISPOSITION

The judgment and the order awarding attorney fees are affirmed. The Developer (plaintiff) is awarded its costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1).)

Ray, P. J., and Scotland, J.,* concurred.

Appellant's petition for review by the Supreme Court was denied March 23, 2011, S190463.

---

*Retired Presiding Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.